2015 VT 60












Post and Beam Equity Group, LLC
and Post and Beam of Mt. Snow, LLC v. Sunne Village Development Property Owners
Association (2014-098)

 

2015 VT 60

 

[Filed 15-May-2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 60
 
 


 


 
 
 No. 2014-098
 
 


 


 
 
 Post and Beam Equity Group, LLC
 and 
 Post and Beam of Mt. Snow, LLC
 
 
 Supreme Court
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
      v.
 
 
 Superior Court, Windham Unit,
 
 
 
 
  
 
 
 Civil Division
 
 
 
 
  
 
 
  
 
 
 
 
 Sunne Village Development
 Property Owners Association
 
 
 October Term, 2014
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Karen
 R. Carroll J.
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 
 
 


Amanda T. Rundle and Christopher M. Rundle of Rundle &
Rundle, PLLC, Springfield, for

  Plaintiffs-Appellees/Cross-Appellants.

 

Allen C. B. Horsley of Barr Lajoie Goldfine, Stowe, for
Defendant-Appellant/Cross-Appellee.

 

Carl H. Lisman, Burlington, Amicus Curiae.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund and Robinson,
JJ., and Morris, Supr. J. (Ret.), 

                    
Specially Assigned

 

 

¶ 1.            
ROBINSON, J.   This case involves a dispute between a
residential subdivision property owners’ association and the owner of
commercial property both in and adjacent to the subdivision concerning access
to property over a subdivision roadway.  It also involves the conduct of
the property owners’ association.  Defendant, Sunne Village Development Property
Owners Association (“the POA”), appeals the trial court’s judgment that it
created a nuisance affecting the commercial landowner; the court’s calculation
of compensatory damages arising from the nuisance; and the court’s award of
punitive damages and attorney’s fees.  Plaintiffs, Post and Beam Equities
Group, LLC, and Post and Beam of Mt. Snow, LLC (collectively “P&B”),[1] cross-appeal, challenging the trial
court’s conclusion that its deeded easement over the subdivision’s road does
not extend to its patrons’ use for access to its restaurants.  We affirm
with respect to the judgment for nuisance and the award of punitive damages and
attorney’s fees, but reverse the award of compensatory damages to P&B. 
In connection with the cross-appeal, we affirm the court’s judgment relating to
interpretation of the deeded easement.

¶ 2.            
P&B owns two adjacent parcels of property in the Town of West Dover.
 P&B operates two restaurants, The Last Chair and Fiddleheads, on
Parcel 1.  Parcel 1 also includes some space for parking.  Parcel 2
consists of three lots used for parking for the restaurants on Parcel 1. 
P&B acquired both parcels by warranty deed in 2010.

¶ 3.            
The restaurant buildings are located on Parcel 1, which is bounded by
Route 100 on one side and Sunne Village Lane on an adjacent side.  At the
time that P&B purchased Parcel 1, cars could enter the parking lot for the
restaurants in two ways: from Route 100 or from Sunne Village Lane.  Route
100 is a narrow, busy road, with heavy traffic during ski season, and prior to
the events described below, Sunne Village Lane provided the primary access to
the parking lot.

¶ 4.            
Parcel 2, the parking-lot property, is bounded by Sunne Village Lane on
one side, and No Name Road on an adjacent side.  Parcel 2 is part of the
Sunne Village Development subdivision.  The three lots that make up Parcel
2 are subject to the subdivision’s 1981 declaration of covenants, which
provide, among other things, for a perpetual right of way and easement for lot
owners over Sunne Village Lane.  By virtue of its ownership of those lots,
P&B is a member of the POA.  Parcel 1 is not part of the subdivision.

¶ 5.            
The following schematic depicts the general relationship of the roads
and parcels in question.[2]



¶ 6.            
The events that gave rise to this lawsuit, as found by the trial court,
are as follows.[3] 
In 2010, when the POA believed that P&B had plans to close the entry onto
P&B’s property from Route 100 and to use the Sunne Village Lane entrance
exclusively, the parties negotiated informally.  In the summer of 2011,
P&B and the POA reached a verbal agreement that allowed P&B to close
the Route 100 entrance.

¶ 7.            
The terms of the written agreement that the POA presented to P&B,
however, contained terms to which P&B had never agreed.  Among other
things, the proposed written agreement required P&B to give up its easement
over Sunne Village Lane and replace it with a revocable license.  P&B
refused to assent to these new terms, and reopened the Route 100 access while
negotiations resumed.

¶ 8.            
In negotiations, the POA took the position that the deeded right of
access for Parcel 2 was limited to residential purposes, and that P&B had
no right to commercial access from Sunne Village Lane to the restaurant parking
lots.  Throughout this period, the POA permitted a different restaurant,
Dover Joe’s, located directly across Sunne Village Lane from the P&B
restaurants, to use an access path off Sunne Village Lane for access to its
property.  In the fall of 2011, after the negotiations failed, the POA
placed—without notice or warning to P&B—large boulders across the Sunne
Village Lane entrance to P&B’s restaurants.  P&B removed the
boulders after consulting with the police department.

¶ 9.            
Almost one year later, in the late summer of 2012, the POA installed a
guardrail in the same location, again without notice to P&B.  The
guardrail prevented access to P&B’s property from Sunne Village Lane.
 The POA also put up numerous “Private Lane—Residents Only” signs on the
entrance to Sunne Village Lane from Route 100.  The barricades erected by
the POA had a significant adverse impact on P&B’s business.

¶ 10.        
P&B filed suit against the POA on September 28, 2012.  In its
complaint and subsequent first and second amended complaints (the latter filed
May 28, 2013), P&B sought: a declaratory judgment that it has an express
easement (in the deed) over Sunne Village Lane to access the restaurant
property; a declaratory judgment that it has a prescriptive easement over the
existing Sunne Village Lane entrance to the restaurant property; compensatory
and punitive damages against the POA for nuisance in connection with the POA’s
obstruction of that entrance; an order enjoining the POA from interfering with
P&B’s use of the roads; an order finding that the POA had violated the
declaration of covenants; a judgment that the POA had violated the Vermont
Common Interest Ownership Act (VCIOA), 27A V.S.A. §§ 1-101 to 4-120; and a
judgment that the POA officers and directors breached their duties of good
faith, loyalty, and ordinary prudence to the POA’s members, 11B V.S.A.
§ 8.42(a), 27A V.S.A. § 3-103.  P&B also sought attorney’s
fees and costs.

¶ 11.        
Following a trial, the court ruled that the declaration of covenants
granted P&B an express easement over Sunne Village Lane for the benefit of
Parcel 2 (the parking-lot parcel), but not for the benefit of Parcel 1 (the
restaurant parcel).  The court concluded that the deeded easement for the
benefit of Parcel 2 did not extend to this contemplated commercial use because
such use would materially increase the burden on the servient estate.  The
court concluded, however, that P&B had acquired a prescriptive easement
over Sunne Village Lane, including access to Parcel 1 through the area blocked
by the guardrail installed by the POA.  The court based its conclusion on
evidence showing that the public had used the Sunne Village Lane entrance to
access the restaurant property as far back as 1975.  The court rejected
the POA’s contention that this longstanding use was permissive, contingent on a
broader agreement between the POA and the restaurant owner.

¶ 12.        
The court ruled in P&B’s favor on its claims that the POA created a
nuisance claim; that the POA had violated the declaration of covenants and
various provisions of the VCIOA; and that the POA board members and officers
had violated their statutory duties of care and loyalty to unit owners. 
The court ordered the POA to remove the no-trespassing signs and the guardrail
blocking access from Sunne Village Lane to P&B’s parking lot and to comply
with the VCIOA and Sunne Village’s declaration of covenants and bylaws. 
The court awarded P&B compensatory damages of $101,500.  Finding that
the POA’s conduct was intentional, malicious, and “truly reprehensible,” the
court concluded that P&B was entitled to punitive damages of $5000. 
Finally, the court concluded that under the fee-shifting provision of the
VCIOA, P&B was entitled to an award of $100,484.34 in reasonable attorney’s
fees and $2,947.35 in costs.  Thus, the total judgment amount awarded to P&B
was $209,931.69.  The court denied the POA’s motion to alter or amend
judgment under Vermont Rule of Civil Procedure 59(e).

¶ 13.        
On appeal, the POA does not challenge the trial court’s finding that
P&B has a prescriptive easement over Sunne Village Lane and the entrance to
Parcel 1.  It argues that (1) the evidence was insufficient to support an
award of compensatory damages to P&B, and that even if compensatory damages
could be awarded, the court’s calculation was erroneous; (2) the evidence does
not support the court’s finding of nuisance because there was no evidence of
actual harm to P&B’s business; (3) the award of certain attorney’s fees and
costs was improper; and (4) the award of punitive damages was improper. 
P&B cross-appeals, arguing that the court erred in finding that its express
easement over Sunne Village Lane created in the declaration of covenants did
not extend to commercial use.[4]

I. 
Compensatory Damages

 

¶ 14.        
P&B argued, and the trial court found, that as a result of the POA’s
placement of the signs and guardrail, P&B suffered losses to its
business.  To quantify its losses, P&B presented evidence of its
general diminution in revenues after the POA installed the signs and guardrail.
 In 2012, P&B’s revenue was $1.3 million; in 2011, it was $1.6
million.  P&B also presented more specific evidence of the drop in
“covers” (the number of meals served) in September, October, and November 2012
as compared to the same months in 2011, as well as the average revenue per
cover.  The trial court found that the restaurants had 2500 fewer covers
in September, October, and November 2012 than during the same period the year
before.  With average revenues per cover of $29, the court calculated a
loss of $72,500 associated with that three-month period.  Due to a number
of variables—including relatively good snow conditions in the 2012-13 ski
season compared to the prior year, and a change in menu and increased
prices—the trial court was unable to make specific findings as to the amount of
loss, if any, suffered by P&B after December 2012.[5]

¶ 15.        
The POA raises a host of challenges to the trial court’s
compensatory-damages calculation.  It argues that there was no basis for a
finding of economic injury because the restaurants had never been profitable
and that the compensatory damages were calculated solely with reference to a
reduction in P&B’s revenue without accounting for the associated reduction
in costs.  The POA also argues that if the trial court had compared the
restaurants’ revenues to the preceding year for the entire seven-month period
that the guardrail was in place, it would have found an increase. 
Finally, the POA asserts that the trial court erred in several ways in
calculating damages using the method it adopted.

¶ 16.        
Generally, the calculation of damages is a question of fact.  Birkenhead
v. Coombs, 143 Vt. 167, 172-73, 465 A.2d 244, 246 (1983).  As long as
“sufficient evidence is introduced to permit with reasonable certainty an
estimation of damages, the task of determining damages will be entrusted to the
sound discretion of the fact finder.  Furthermore, where an action does
not permit exact computation, an award of damages must stand unless grossly excessive.” 
Id. at 173, 465 A.2d at 247 (citations omitted).

¶ 17.        
The plaintiff bears the burden of establishing the extent of damages by
a preponderance of the evidence.  Damages need not be exact or precise,
but do need to be supported by evidence.  Capital Garage Co. v. Powell,
98 Vt. 303, 309, 127 A. 375, 378 (1925) (stating that damages claimed “must not
be uncertain, speculative, or remote,” but they also “need not be susceptible
of calculation with mathematical exactness . . . provided there is a
sufficient foundation for a rational conclusion” (quotation omitted)).
 “Difficulty in computing damages does not necessarily preclude the
[factfinder] from awarding damages if there is sufficient evidence from which
it could have made a reasonable determination of damages.”  Foti Fuels,
Inc. v. Kurrle Corp., 2013 VT 111, ¶ 34, 195 Vt. 524, 90 A.3d 885
(quotation omitted).

¶ 18.        
We reject the POA’s suggestion that because P&B had not been
profitable, it could not recover compensatory damages for the reduced business
that the trial court found resulted from the POA’s obstruction of the Sunne
Village Lane entrance.  The purpose of compensatory damages in this case
is to put P&B in the position it would have occupied if the POA had not blocked
the entrance.  See Restatement (Second) of Torts § 903 cmt. a (1979)
(“[C]ompensatory damages are designed to place [a person] in a position
substantially equivalent in a pecuniary way to that which [the person] would
have occupied had no tort been committed.”).  A restaurant that has been
operating for some time but has not yet become profitable can still be
measurably damaged, and is still entitled to compensatory damages, if it can
show that a nuisance caused profits to decrease or losses to increase.  This
is not a case in which the claimed damages were based solely on the expected
profits of a not-yet-operating business with no track record against which to
measure those expectations.  Cf. My Sister’s Place v. City of
Burlington, 139 Vt. 602, 613, 433 A.2d 275, 282 (1981) (“[E]xpected profits
from a new business are too speculative and uncertain to be considered in a
damage award”).  Instead, the trial court here compared P&B’s
patronage after the POA placed the guardrail across the entrance with P&B’s
patronage during a comparable period the prior year.

¶ 19.        
Nevertheless, we agree with the POA that the evidence of lost revenues
relied upon by the trial court cannot support its finding concerning lost
profits.  The court could reasonably infer in this case that lost
customers, and the associated loss in revenues, were indicative of lost
profit.  But without evidence of the impact of the reduction in patronage
on P&B’s costs, the court could not reliably quantify the lost profits.

¶ 20.        
We recently considered this issue in the context of a breach-of-contract
case.  In Foti Fuels, the party claiming consequential damages as a
result of a breach of a no-competition agreement alleged a loss of about
$140,000 a year in revenue from sales of diesel and home-heating oil.  We
held that “[e]ven assuming that defendant could establish that the lost
revenues were caused by a breach, . . . the jury had
‘nothing at all to go on’ in determining any corresponding loss of profits . . . . 
Absent any understanding of profit margins, the jury would be unable to
rationally translate these lost revenues into a reasonable estimate of lost
profits.”  2013 VT 111, ¶ 36; see also McGee Constr. Co. v.
Neshobe Dev., Inc., 156 Vt. 550, 557, 594 A.2d 415, 419 (1991) (“As applied
to this case, the damages would be calculated by subtracting from the contract
price, [the contractor’s] cost of completion and other costs avoided.”
(citations omitted)); VanVelsor v. Dzewaltowski, 136 Vt. 103, 105, 385
A.2d 1102, 1104 (1978) (“Where the owner breaches the contract . . .,
the contractor is entitled to recover the contract price less [the] cost to
perform the remainder of the contract.”).

¶ 21.        
The underlying principle in these contract cases applies with equal
force to a determination of lost profits in a nuisance case.  If a
restaurant’s fixed costs (such as rent and utilities) are quite high, and the
costs that rise and fall in relation to the restaurant’s actual patronage (such
as the cost of the food served) are quite low, its lost revenues as a result of
decreased patronage may closely correspond to its lost profits.  If, on
the other hand, a drop in a restaurant’s patronage is matched by a substantial
drop in the costs expended for food and staff, its lost revenues may greatly
exceed its actual lost profits.  The record in this case is devoid of
evidence on this point.  P&B’s evidence focused exclusively on
revenues—both gross revenues and revenues per cover.  We simply do not
know what costs, if any, P&B was able to avoid as a result of the drop in
covers.  On this record, any leap from lost revenues to lost profits is
necessarily speculative.

¶ 22.        
P&B’s evidence need not have established its fixed and avoidable
costs with “mathematical exactness,” Capital Garage, 98 Vt. at 309, 127
A. at 378 (quotation omitted), but P&B was required to present sufficient
evidence to support a reasonable determination of its lost profits.  See Foti
Fuels, 2013 VT 111, ¶ 34.  In this case, P&B did not present
even generalized evidence that its costs remained stable during the period in
question.  Cf. S. States Coop., Inc. v. Melick Aquafeeds, Inc., 476
F. App’x 185, 190-91 (11th Cir. 2012) (affirming jury award of lost profits
based on lost revenues where plaintiff had presented testimony that plaintiff’s
“expenses remained stable during the time period at issue in [the]
case”).  Although the trial court’s findings would support an award of
nominal damages, we cannot affirm the court’s award of compensatory damages in
this case because of this hole in the evidentiary record.[6]

II.
 Nuisance

¶ 23.        
In addition to its argument that the trial court’s award of compensatory
damages is unsupported, the POA argues that the guardrail was not a nuisance
because there is no evidence that it actually harmed P&B.

¶ 24.        
“A private nuisance is a nontrespassory invasion of another’s interest
in the private use and enjoyment of land.”  Restatement (Second) of Torts
§ 821D.  To prove a nuisance, plaintiffs must demonstrate an
“interference with the use and enjoyment of another’s property” that is “both
unreasonable and substantial.”  Coty, 149 Vt. at 457, 546 A.2d at
201; see also John Larkin, Inc. v. Marceau, 2008 VT 61, ¶ 10, 184
Vt. 207, 959 A.2d 551 (injury must be “actual and substantial”).  “The
standard for determining whether a particular type of interference is
substantial is that of ‘definite offensiveness, inconvenience or annoyance to
the normal person in the community.’ ”  Coty, 149 Vt. at 457,
546 A.2d at 201 (quoting W. Prosser, Law of Torts § 87, at 578 (4th ed.
1971)).  We will uphold the factfinder’s determination that an
interference is a nuisance if that determination is “adequately supported by
credible evidence.”  Id.

¶ 25.        
Here, the trial court found that the blockade caused difficulties for
vehicles (especially those towing trailers with snowmobiles), leading to
complaints by patrons and lost business and revenue.  There was ample
evidence to support the court’s findings.  The court heard testimony from
one witness who said that every time he was there on a weekend he saw “confused
cars who are used to pulling into Sunne Village [Lane] and having that access”
encountering the barrier and attempting to “figure out another way in,” or
simply turning around and leaving.  Four times over that winter, that
witness observed trailers that encountered difficulties on the narrow road,
including at least some driven by patrons or former patrons of the restaurants.
 The trial court considered testimony that the entrance to the parking lot
from Route 100 was dangerous, particularly for drivers towing trailers and
snowmobiles, and that patrons had complained to the restaurant partners. 
Moreover, the erection of the guardrails occurred without warning and just
prior to the ski season, which was the busiest time of year for the
restaurants.  Given these facts, we find no difficulty in upholding the
trial court’s determination that the level of the POA’s interference with
P&B’s use and enjoyment of its land was sufficiently unreasonable and
substantial to be a nuisance.  See Restatement (Second) of Torts
§ 826(a) (“An intentional invasion of another’s interest in the use and
enjoyment of land is unreasonable if . . . the gravity of the harm
outweighs the utility of the actor’s conduct . . . .”).

III.  Punitive
Damages

 

¶ 26.        
In considering the POA’s challenge to the trial court’s award of
punitive damages, as well as its claims under the VCIOA, we review the evidence
and the trial court’s findings concerning the POA’s course of conduct in more
depth.

¶ 27.        
The trial court found that in the spring of 2012—after the POA had
placed boulders across the Sunne Village Lane entrance to Parcel 1 and P&B
had removed them, but before the POA constructed a guardrail across the
entrance—at the direction of the POA board, POA vice president Doug Sages began
to communicate with P&B.  The board took the position that P&B had
no right to use Sunne Village Lane to access Lots 2, 3, and 4 without the
board’s approval, and that the installation of the boulders and guardrail and
the erection of the signs was a permissible assertion of the POA’s rights.
 After P&B again declined to sign the agreement under which P&B
would agree to pay money to the POA and waive valuable rights, Sages
acknowledged that if he were in P&B’s position, he probably would not have
agreed to the POA’s demands either, but noted, “I’m not the one who has had my
road closed.”  He implied that if P&B refused to accept the POA’s
demands, the POA would force P&B to move items in the lot at least twenty
yards from the roadway, causing the loss of several parking spaces.

¶ 28.        
After placing the guardrail without warning, Sages sent P&B an email
on December 4, 2012, that the trial court characterized as strong-arming. 
In the email, Sage suggested that P&B should be concerned about when a
hearing in court would be held and noted that extended litigation would cause a
loss of money, time, and use of the entrance for the ski season.  Sages
then proposed a settlement that would require P&B to pay $5000 for removal
of the guardrail and to relinquish its perpetual right of access for Sunne
Village Lane so that, as Sages wrote, P&B would “be able to enjoy the
access before Xmas and for this winter season.”

¶ 29.        
The trial court found that throughout the negotiations between P&B
and the POA, the POA board frequently disregarded its governing covenants and
required procedures.  The Sunne Village declaration of covenants provide
that the POA was established “for the maintenance and repair of [Sunne Village]
Road and sewer system.”  This is the only purpose of the POA as declared
in the covenants.  The declaration provides that the fees may be assessed
to POA members for the cost of

operation,
maintenance, improvement, replacement and repair of [Sunne Village] Road and
appurtenant improvements to provide all-year, all-weather, access to the lots
within the subdivision served by the road . . . together with such
other reasonable expenditures for operation, maintenance, replacement or repair
of [Sunne Village Lane] and [subdivision] sewer system and improvements the
[POA] may from time to time deem necessary.

 

Among other provisions, the covenants provide that each
lot owner has one vote for each lot owned; that all matters to be determined by
the POA shall be taken by “a vote of the majority of the record owners at the
time the vote is taken”; that the POA members shall appoint a POA director
responsible for contracting for “services . . . to maintain and
repair” the road[7];
and that a treasurer shall be appointed to maintain the POA’s books and records
and provide bills and statements of account to lot owners.

¶ 30.        
The erection of the signs, guardrail, and barrier was directed by the
POA board without the approval or notification of the POA membership, and no
meeting minutes discussing the action were presented.  The trial court
found that “[t]he decision was made via email or phone calls.”  In 2011,
the POA spent approximately $4000 for a survey of the area and for the purchase
and installation of boulders and a guardrail, as well as $2982 to attorneys who
advised the POA on the use of boulders, but the 2012 financial information
provided to the POA membership did not reflect this data.  POA board vice
president Sages testified that this information was missing because the checks
had not yet cleared.  Other evidence contradicted this assertion, and the
trial court found that Sages’ testimony on this point was not credible.

¶ 31.        
P&B, as a POA member by virtue of its ownership of the lots
comprising Parcel 2, had a right to receive information about planned POA
action, but did not receive such information.  For example, P&B did
not receive the minutes of POA meetings in 2011 and 2012 and, until the trial
began, did not receive any meeting agendas mentioning the ongoing dispute
between P&B and the POA.  Nor was P&B consistently given notice of
meetings.  On January 8, 2013, P&B received an email notice of a
February 16, 2013 POA meeting.  The email stated that formal notice and a
proxy ballot would follow by regular mail, but P&B never received these documents.

¶ 32.        
 After the guardrail was installed, and after the first day of
trial in the case, the POA board sent a notice of a special emergency meeting
to its members, to be held on June 2, 2013.  The notice did not
specifically state that litigation was ongoing or that a court trial had begun,
but mentioned the guardrail and asked the POA membership to retroactively
ratify “the actions of Doug Sages and other members of the [board] to settle
the litigation and to enter into an agreement with P&B.”[8]  The board sought ratification of
its decisions to block access to Sunne Village Lane with boulders and later a
guardrail; hire surveyors and legal counsel; allow Sages to represent the board
in court; allow the board to negotiate and pursue settlement with P&B; and
reject P&B’s proposed parking-lot plans.

¶ 33.        
Sunne Village residents were not clearly informed that the POA was
engaged in litigation with P&B until July 2013, well after the trial began
in April 2013.[9] 
This late disclosure occurred only after members of the POA began to question
the board’s conduct.  For example, one POA member sent an email in
September 2012 asking how much the guardrail cost to install.  The board
members then corresponded among themselves via email about whether to provide
the information or “put it off” until the annual meeting.  When the board
finally provided the information, the POA member followed up, asking whether
the number provided included legal fees.  The board responded that there
were no legal fees paid specifically for guardrail-related matters, because
fees for discussion of the guardrail came out of the POA counsel’s retainer and
were not separately billed.  The POA board president admitted that this
was “splitting hairs.”  The board also told the member that P&B
“wouldn’t agree to anything” and made “no attempt . . . to agree to
anything.”  The trial court found that this was “inaccurate and
misleading,” since P&B had in fact negotiated with the POA board in good
faith, and had reached a verbal agreement with the POA, with the agreement
collapsing because of the POA’s decision to present a written agreement to
P&B that did not accurately reflect the parties’ verbal agreement.

¶ 34.        
In May 2013, another POA member, who owns a lot along No Name Road
directly behind Parcel 2, began to send emails to the POA board complaining
about the decision to block P&B’s access to Sunne Village Lane.  The
obstruction had caused cars to travel along No Name Road to reach the back of
the P&B property.  This member requested “all official discussion
about the actions being taken upon” P&B to be sent to him for his review,
questioned whether the POA board was properly exercising its fiduciary duties,
and suggested he might take legal action.  The board responded that the
actions taken against P&B were because P&B had threatened to block the
Route 100 access to their property.  The trial court found that this
statement to be “intentionally misleading and inaccurate.”

¶ 35.        
In the same month, two other members asked the POA board whether members
were being asked to ratify legal fees that had not been assessed; they
expressed concern about whether the POA would be liable for legal fees in
excess “of the settlement.”  Knowing there was no settlement and that
court hearings had actually begun, Sages responded that P&B intended to
close off the Route 100 access.  The trial court found this statement to
be inaccurate, especially given that P&B principals had already testified
at trial that they had no intention to close the Route 100 access.

¶ 36.        
The trial court found that the first time the amount of legal fees was
disclosed to members was in an August 2013 email, close to the end of trial, in
which POA members were told that the cost would be over $26,000.  This was
much greater than the estimate of $3,000 given to POA members at the 2012
annual meeting, although court proceedings had already begun by that
time.  The court found that the POA membership had not authorized the
board to incur these fees on its behalf, and that the costs had already been
paid by the time the POA heard how much the litigation had cost.

¶ 37.        
On the basis of these and other findings, the trial court concluded that
the POA board engaged in intentional, unreasonable, bad-faith, and malicious
behavior, supporting an award of punitive damages in the amount of $5000. 
The court specifically noted that the POA board intentionally misled the POA
members; intentionally failed to provide accurate information to the members
about this litigation; presented an agenda and minutes to POA members designed
to mislead; blocked P&B’s rightful access to its parking lot without notice
and just prior to the ski season, when the restaurant was most busy; allowed a
nonmember restaurant owner to continue to use Sunne Village Lane in the same
manner as P&B; and insinuated that it would drive up litigation costs if
P&B did not agree to meet various demands.  The court found that these
acts were driven by bad spirit and wrong intention, reflected bad faith toward
the members of the POA, and constituted “truly reprehensible conduct.”

¶ 38.        
The POA appeals the award of punitive damages, arguing that the findings
of malice are not supported by the evidence; that there was no “evidence of
personal animus” in particular; and that many of the Board’s actions were mere
“administrative and budgetary lapses.”

¶ 39.        
“In evaluating a punitive damages award, we defer to the trial court.
Punitive damages by their nature cannot be precisely measured, and their
assessment is largely within the fact-finder’s discretion.”  Pion v.
Bean, 2003 VT 79, ¶ 44, 176 Vt. 1, 833 A.2d 1248 (citation omitted).
 Accordingly, we will not overturn a punitive damages award unless the
award “is manifestly and grossly excessive,” id. (quotation omitted), or
“the evidence of [defendants’] wrongful actions [is] insufficient to support an
award of punitive damages,” Monahan v. GMAC Mortg. Corp., 2005 VT 110,
¶ 71, 179 Vt. 167, 893 A.2d 298.

¶ 40.        
“The purpose of punitive damages is to punish . . . truly
reprehensible conduct” and “to deter a wrongdoer from repetitions of the same
or similar actions.”  Brueckner v. Norwich Univ., 169 Vt. 118, 129,
730 A.2d 1086, 1095 (1999) (alteration and quotations omitted).  Punitive
damages are permitted only when defendant’s acts are not merely “wrongful or
unlawful,” but “intentional and deliberate” and conducted with “actual
malice”—that is, “bad spirit and wrong intention,” having “the character of
outrage frequently associated with crime.”  Id. (quotations
omitted).  The requisite degree of actual malice “may be shown by conduct
manifesting personal ill will or carried out under circumstances
evidencing insult or oppression, or even by conduct showing a reckless
or wanton disregard of one’s rights.”  Id. (emphasis added)
(quoting Shortle v. Cent. Vt. Pub. Serv. Corp., 137 Vt. 32, 33, 399 A.2d
517, 518 (1979).  Accordingly, even if the POA lacked any “personal
animus” toward P&B, this would not preclude an award of punitive damages,
because conduct that is not based upon personal hatred or dislike may
nevertheless be malicious—it may be insulting or oppressive, or carried out
with “reckless or wanton disregard of [another’s] rights.”  Id.

¶ 41.        
Here, we find that the evidence supports the court’s findings, and that
those findings support the court’s determination that the POA’s conduct evinced
malice.[10]
 The conduct relied upon by the trial court encompassed multiple actions
by the POA board over a series of months.  The POA board deliberately and
repeatedly deceived POA members concerning the existence and status of the
litigation with P&B, and its own intentions, conduct and expenditures in
connection with that litigation.  As an owner of three lots in the
subdivision, P&B was among the members to whom this bad-faith conduct was
directed.  Moreover, the court found that the POA attempted to improperly
strong-arm P&B into relinquishing legal rights by insinuating that it would
drive up litigation costs if P&B did not meet its demands.  In the
meantime, the POA continued to allow a non-POA restaurant owner to use Sunne
Village Lane for access to its restaurant, free of charge.  These findings
were sufficient to support the conclusion that the POA’s actions in this case
evidenced insult or oppression or were carried out in reckless or wanton
disregard of P&B’s rights.  We thus affirm the punitive damages award.




 

IV.  Attorney’s Fees

 

¶ 42.        
The procedural history of the case is important to understanding the
attorney’s fee dispute.  P&B filed its original complaint for
declaratory judgment on September 27, 2012.  In the original complaint,
P&B asserted a right of access for its patrons over Sunne Village Lane
pursuant to deed, a prescriptive easement, trespass, nuisance, and unjust
enrichment.  These claims are all common-law claims and were the only
claims before the court on April 12, 2013, the first day of trial in this
case.  The parties did not finish presenting evidence on April 12, and the
court scheduled additional hearing time in the summer.  On May 8, 2013,
before the trial’s continuation, P&B filed its first amended complaint,
alleging for the first time that the POA had committed various violations of
the VCIOA, including violations of statutory requirements relating to meetings,
protection of unit owners, and recordkeeping; unlawful blockage of a common
element of access (i.e., the roadway); violation of the declaration of
covenants; and violations of the duties of care and loyalty imposed on POA
officers.  P&B filed its second (and final) amended complaint, adding
additional VCIOA claims, on May 28, 2013.[11]  In this second amended complaint,
P&B added claims that the POA and its board members and officers
(1) failed to retain meeting minutes and records of all actions taken,
provide records to all unit owners, and maintain accounting records, as
required by 27A V.S.A. § 3-118; (2) failed to provide records of meetings
to all members and comply with open-meetings law, as required by
§ 3-108(b); and (3) breached the duties of care and loyalty set forth in
§ 3-103.

¶ 43.        
The trial court, in its order, awarded P&B reasonable attorney’s
fees “in connection with this litigation and the events which relate to and
preceded it.”  The court made this award under 27A V.S.A. § 4-117(a),
the fee-shifting provision of the VCIOA, which provides that “[a] declarant,
association, unit owner, or any other person subject to this title may bring an
action to enforce a right granted or obligation imposed by this title, the
declaration, or the bylaws.  The court may award reasonable attorney fees
and costs.”

¶ 44.        
P&B subsequently filed affidavits for fees and costs for
$104,551.69, covering services rendered from September 5, 2012 to January 6,
2014.  The POA challenged the claimed attorney’s fees, arguing that any
legal fees incurred before April 15, 2013, when P&B’s counsel’s records
first reflect consideration of a VCIOA claim, could not be properly awarded
under the VCIOA fee-shifting statute because those common-law claims were
distinct from the VCIOA claims to which the fee-shifting statute applies.[12]

¶ 45.        
The trial court rejected the POA’s objections and awarded attorney’s
fees for services performed in connection with the litigation, without regard
to the timing of the services.  The court explained that one of the
violations of the VCIOA that supported its attorney’s fee award was the POA’s
violation of the declaration of covenants by putting up the guardrail across
P&B’s easement.  Although the VCIOA claim was not raised until the
amended complaint, the facts that supported the violation were part of the
original complaint.  The court concluded that most of the evidence
presented in this case was relevant to all claims.  Because the multiple
theories of recovery ultimately advanced by P&B, including the VCIOA claim,
involved a common core set of facts, the court declined to limit the attorney’s
fee award to legal services performed after P&B expressly raised the VCIOA
claim.

¶ 46.        
On appeal, the POA argues that P&B’s VCIOA claims do not revolve
around a common core of facts with the common-law claims that were at the
center of the litigation prior to P&B’s filing of its first amended
complaint.  The POA argues that fees associated with these common-law
claims are thus not properly recoverable under the VCIOA.  In particular,
the POA argues that the central claims in the case prior to the first amended
complaint did not involve a member of the POA seeking to vindicate its rights
as such but, rather, involved declaratory and injunctive relief and damages for
the benefit of the owner of Parcel 1—a parcel that is not subject to the
benefits and obligations of membership in the Sunne Village development.
 The POA also argues generally that the fees associated with the VCIOA
claims are excessive.

¶ 47.        
Like other fee-shifting statutes, 27A V.S.A. § 4-117(a) is an
exception to the usual “American rule” requiring parties to bear their own
costs of litigation.  L’Esperance v. Benware, 2003 VT 43,
¶ 21, 175 Vt. 292, 830 A.2d 675.  The interpretation of the
fee-shifting statute and “the decision of a trial court granting attorney’s
fees as a matter of law” are “reviewed de novo on appeal.”  Southwick
v. City of Rutland, 2011 VT 105, ¶ 4, 190 Vt. 324, 30 A.3d 1298.
 The determination of the reasonableness of an award, however, is reviewed
for abuse of discretion.  L’Esperance, 2003 VT 43, ¶ 21 (“When
determining an award of attorney’s fees, the trial court must make a
determination based on the specific facts of each case and, accordingly, we
grant the trial court wide discretion in making that determination.”).

¶ 48.        
Courts are frequently called upon to consider statutory attorney’s fee
awards in cases involving multiple claims, some of which are subject to a
fee-shifting statute, and some of which are not.  As we have recognized,
it is frequently impossible to parse out, claim-by-claim, legal services
rendered in cases involving “a common core of facts.”  Id.
¶ 24 (noting that it is “quite common” for lawsuit to not involve “a
series of discrete claims”).  Accordingly, the trial court has the
discretion “to focus on the significance of the plaintiff’s overall results in
relation to” the work reasonably performed “in cases where the plaintiff’s
claims contained a common core of facts or were based on related legal
theories.”  Id. ¶ 25 (citing Hensley v. Eckerhart, 461
U.S. 424, 435 (1983)); Electric Man, Inc. v. Charos, 2006 VT 16,
¶ 10, 179 Vt. 351, 895 A.2d 193 (noting that where “claims at issue share
a common core of facts and multiple theories of recovery,” and “[v]irtually all
of the evidence is relevant to all the claims[,] [t]he
lawsuit cannot ‘be viewed as a series of discrete claims’ ” (quoting L’Esperance,
2003 VT 43 ¶ 24)).

¶ 49.        
On the other hand, sometimes the respective claims in a case are so
distinct that a court cannot reasonably conclude that they arise from a common
core of facts.  For example, in Nystrom v. Hafford, an unmarried couple broke up and Nystrom sought partition of
property jointly titled to them.  2012 VT 60, 192 Vt. 300, 59 A.3d 736.  Hafford argued that he had
conveyed the property to the parties jointly in anticipation of marriage, and
that Nystrom was not entitled to partition.  At issue were the extent of
the parties’ respective contributions and equitable interests in the property,
the balance of equities between the parties with respect to assignment of the
property, and Nystrom’s parents’ entitlement to reimbursement for their
financial contributions to the construction of the property.  Nystrom’s
father also made a claim against Hafford under the Prompt Pay Act (PPA) for his
labor in constructing the house on the property subject to the partition
action.  Hafford prevailed on the PPA claim, but the trial court declined
to award him attorney’s fees.  We reversed on the attorney’s fee issue,
explaining that

PPA
claims typically arise in construction disputes in which one party seeks to be
paid for its work and the other party seeks to avoid paying on the ground that
the work was deficient. In such cases, the commonality of facts underlying the PPA claim and related claims
and defenses sounding in contract, unjust enrichment, consumer fraud, or other
such causes of action, is apparent.  This case falls outside of that
paradigm. That is, this case is not a typical construction dispute in which a
court cannot reasonably determine the substantially prevailing party with
respect to the PPA claim without taking into account the panoply of other
claims on the table.

 

 
. . . [The other] claims do not spring from a core of facts in
common with father’s PPA claim, which focused solely on his claim for
compensation for the time and labor he contributed to the building project, and the evidence underlying these claims is largely distinct from
the evidence offered to prove and rebut father’s PPA claim.

 

Id.
¶¶ 21-22 (citations and footnote omitted).  The POA essentially
argues that this case is like Nystrom because the evidence concerning
the common-law claims litigated before P&B filed its first amended
complaint and the evidence concerning the POA’s various breaches of the VCIOA
were distinct and easy to parse.

¶ 50.        
We acknowledge that this is a close case, but conclude that the trial
court did not abuse its discretion in determining that most of the evidence
presented was relevant to all claims.  The POA’s conduct leading up to and
throughout the course of these proceedings was the basis for a number of the
VCIOA violations found by the trial court; it was also relevant to P&B’s
common-law nuisance claim, especially with respect to its claim for punitive
damages.  At the preliminary-injunction hearing, and at the first day of
trial on the merits—both of which occurred before P&B made its VCIOA
claim—the parties presented evidence about who did what (and when) in
connection with the dealings between P&B and the POA.  Although the
VCIOA claims required the parties to drill down more deeply, the overarching
narrative at the heart of this case from the outset was part and parcel of the
VCIOA claims.  Moreover, as the court explained, P&B’s VCIOA claim
that the POA violated the declaration of covenants by putting up a guardrail
was intertwined with the question of whether P&B had an easement to begin
with.[13]

V.  Scope of Deeded Easement

¶ 51.        
On cross-appeal, P&B contests the trial court’s conclusion that
P&B’s express, deeded easement allowing for the use of Sunne Village Lane
to access Parcel 2 does not encompass the use contemplated here, which would
overburden the easement.[14]

¶ 52.        
The declaration of covenants establishing the express easement states:

[T]he
Subdivision Roadway . . . shall be held and conveyed in common
ownership among the owners of the lots within the Subdivision with each lot
owner owning in fee simple an undivided 1/28th interest in said Subdivision
Roadway in common with all other owners of lots within the Subdivision,
provided that the ownership interest of each lot owner in the Subdivision Road
shall be subject to and benefitted by a perpetual right-of-way and easement
over and upon said Subdivision Road in common with the owners of other lots
within the Subdivision, their respective heirs, successors, administrators,
assigns, guests, and invitees . . . .

 

 
. . . .

 

 
ALTERATION OF OR ACCESS TO THE SUBDIVISION ROAD.  Except as hereinafter
provided there shall be no improvements or alterations of the Subdivision Road
except in accordance with the approved plans.  Each lot owner shall, upon
written application to the Association, construct a reasonable access driveway
entering onto the subdivision road so long as such access driveway does not
adversely affect, or impair the Subdivision Road, or result in any undue safety
hazard.

 

¶ 53.        
The deed by which P&B acquired title to Parcel 2 repeats the grant
of “an easement and right-of-way” to P&B and its heirs and assigns, and
states that “[s]aid easement [is] to be for all normal and usual purpose of
vehicular and pedestrian ingress and egress from the parcel . . . to
and from . . . Route 100.”

¶ 54.        
Because the declaration of covenants contain no language limiting the
use of Sunne Village Lane or No Name Road to residential purposes, P&B
argued in the trial court that it grants unrestricted use to each lot owner.
 The court rejected this argument, concluding that the commercial use
contemplated here was beyond the intended scope of the easement.  The
court explained that (1) the subdivision plan laid out building lots for
residential purposes; (2) the declaration of covenants referred to constructing
driveways off the roadway for access to residential lots; and (3) the easement
over Sunne Village Lane was for the “normal and usual purposes of vehicular and
pedestrian ingress and egress.”  The court found that these facts
indicated that the easement’s intended purpose was to allow access to
residential lots, and that allowing a large number of vehicles to travel onto
No Name Road and P&B’s parking lots “would materially increase the burden
on the estate” in a way not contemplated by the easement.

¶ 55.        
On cross-appeal, P&B renews its contention that the express easement
in favor of the lots on Parcel 2 allows for this commercial use.  P&B
emphasizes that the declaration does not contain any restriction against such
use.  While P&B disclaims any “present intent to utilize the No Name
Road for access to the rear of the Parking Lot Property,” it suggests that any
future commercial use of the road would not overburden the easement, and a bar
on commercial use of the road “may impede future development of the Parking Lot
Property.”[15]

¶ 56.        
The interpretation of an express easement is a “question of law, which
we review de novo.”  Creed v. Clogston, 2004 VT 34, ¶ 13, 176
Vt. 436, 852 A.2d 577.  “In construing an express easement, as in
construing a deed or declaration of covenants, “[o]ur master rule
. . . is that the intent of the parties governs.”  DeGraff v.
Burnett, 2007 VT 95, ¶ 20, 182 Vt. 314, 939 A.2d 472 (quotation
omitted); see also Rowe v. Lavanway, 2006 VT 47, ¶ 11, 180 Vt. 505,
904 A.2d 78 (mem.) (“Our goal in interpreting a deed is to implement the intent
of the parties.”).  If the terms of the express easement are
unambiguous—that is, if reasonable people could not interpret it in different
ways—then we “enforce the terms as written without resort to rules of
construction or extrinsic evidence.”  DeGraff, 2007 VT 95,
¶ 20 (quotation omitted).  “If ambiguity exists, however, the
interpretation of the parties’ intent becomes a question of fact to be
determined based on all of the evidence—not only the language of the written
instrument, but also evidence concerning its subject matter, its purpose at the
time it was executed, and the situation of the parties.”  Id.
(quotation omitted).

¶ 57.        
Several principles guide our interpretation of express easements. 
First, “a dominant estate is entitled to use an easement ‘in a manner that is
reasonably necessary for the convenient enjoyment of the servitude.’ ” 
Rowe, 2006 VT 47, ¶ 23 (quoting Restatement (Third) of Property,
Servitudes § 4.10 (2000)).  Second, the easement must be used “in a
manner consistent with the use contemplated at the time of its creation” and
may not be used “in a way that materially increases the burden on the servient
estate.”  Id. ¶ 22 (citing Greenberg v. Hadwen, 145 Vt.
112, 116, 484 A.2d 916, 918 (1984)).  “Whether a particular use
overburdens an easement . . . depends on the easement’s original
purpose and the scope of its authorized use.”  Farrell v. Vt. Elec.
Power Co., 2012 VT 96, ¶ 13, 193 Vt. 307, 68 A.3d 1111.  The
third principle follows naturally from the other two: the “manner, frequency,
and intensity of the use [of the easement] may change over time to take
advantage of developments in technology and to accommodate normal
development[,] . . . permit[ting] servitudes to retain their utility
over time,” if doing so would “reflect[] the expectations of the parties
who create servitudes of indefinite duration.”  Rowe, 2006 VT 47,
¶ 23 (quoting Restatement (Third) of Property, Servitudes § 4.10
& cmt. f); see also Farrell, 2012 VT 96, ¶ 13 (“If a new use of
an easement is consistent with the original purpose of an easement, then no
additional taking or easement is required.” (quotation omitted)).

¶ 58.        
In Rowe, we construed an easement (contained in an 1881 deed)
granting the dominant estate “ ‘the right to pass through [the servient
estate] in the lane as it now is . . . for all purposes
whatever.’ ”  Id. ¶ 3.  We found that the use of
automobiles was “consistent with the use contemplated at the time of [the
easement’s] creation” and would not “materially increase[] the burden on the
servient estate.”  Id. ¶ 22 (“[B]ecause there was no
limitation on the grantee’s use of the right-of-way in the 1881 deed that
created it, none should be imported merely because, over time, horses had been
replaced by automobiles and cows by ATVs.”).

¶ 59.        
Here, the deed in question does not contain such broad language
encompassing all purposes whatsoever, but also does not expressly limit the
character or volume of use.  Our task is to infer the “intent of the
parties, as drawn from the language of the deed, the circumstances existing at
the time of execution, and the object and purpose to be accomplished by the
easement.”  Barrett v. Kunz, 158 Vt. 15, 18, 604 A.2d 1278, 1280
(1992).

¶ 60.        
Although nothing in the founding documents appears to limit lots in the
subdivision to residential use, the subdivision plan and the history we can
glean from the record suggest that the subdivision was intended to be
residential.  Further, the declaration of covenants provides that each lot
owner shall bear an equal percentage of the common expenses to insure and
maintain the subdivision road and the common sewer system.  This provision
suggests an expectation that the actual use and impact of the respective lot
owners would be similar.  Finally, the initial deed to P&B’s
predecessor in title, and the subsequent deeds, state that the easement is “for
all normal and usual purposes of vehicular and pedestrian ingress and egress
. . . to and from . . . Route 100, as well as for the
installation of all normal and usual utilities to serve the parcel.”  The
burden associated with the normal and usual vehicular and pedestrian ingress
and egress to a residential dwelling is far more modest than the burden
associated with the operation of two busy restaurants.[16]

¶ 61.        
P&B contends that their predecessors in title purchased the property
from the developers of the subdivision for the purpose of adding to the parking
for the restaurant, and that the use of the easement by P&B’s predecessors
in title has from the beginning always been the commercial use in place
today.  It is true that a year after filing the declaration of covenants,
the original developer sold the three lots that make up Parcel 2 to a person
who already owned and operated a restaurant on Parcel 1, and that Parcel 2 has
served as a parking lot for the restaurants since that time.

¶ 62.        
We nonetheless reject P&B’s argument that the easement contained in
the declaration of covenants allows for a burden on the roadway easement
commensurate with the operation of these restaurants.  First, P&B’s
argument requires us to draw an inference that the original developer
understood that the initial purchaser planned to use Parcel 2 as a restaurant
parking lot, and that the developer believed the burden on the roadway easement
associated with such use to be consistent with the declaration of
covenants.  There is no direct evidence on this point.  Second, the
transfer in question occurred more than a year after the declaration of
covenants was filed, and the obligations and benefits of the covenants had
attached with respect to existing lot owners.  Third, and most
significantly, given the trial court’s findings that the disputed access to
Parcel 1 was used as early as 1975, the developer could also have assumed that
the initial purchaser of Parcel 2 would rely on that access for restaurant
patrons parking on Parcel 2 so that the burden on subdivision roads would not
be impacted by the acquisition.

¶ 63.        
For the reasons set forth above, we affirm the judgment for P&B on
its nuisance claim; uphold the award of punitive damages and attorney’s fees;
affirm the judgment that P&B’s deeded easement for access does not include
access for patrons of two restaurants; and reverse the award of compensatory
damages because of the lack of evidence to support the award.

The
judgment for P&B on its claim for nuisance is affirmed.  The award of
punitive damages and attorney’s fees is affirmed.  The judgment for the
POA concerning the scope of P&B’s deeded access to lots 2, 3, and 4 is
affirmed.  The award of compensatory damages is reversed for lack of
evidence to support it.

 


 
 
  
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


                                                                          
Associate Justices














[1]
 The property at issue in this case is titled only to Post and Beam
Equities Group, LLC.  For ease, we refer to both Post and Beam entities
individually and collectively as “P&B,” even where we refer solely to
matters relating to ownership of the property.





[2]
 This schematic was not in evidence, and is not drawn to scale.  It
is included solely to illustrate the arrangement of the roads and lots that are
relevant to this case.

 





[3]  We
provide a general overview of the facts here, and explore the record in more
detail in connection with the specific issues raised on appeal.





[4]
 By permission of the Court, attorney Carl Lisman filed an amicus brief in
this appeal.  See V.R.A.P. 29.  Amicus does not merely present an
expanded or alternate theory or perspective on a claim raised in this appeal,
but rather advocates reversal of the trial court’s judgment on a claim not
appealed by the POA.  In particular, amicus argues that the trial court
erred in concluding that the POA’s officers had breached a fiduciary duty to
P&B.  States differ on whether an amicus may raise an issue not raised
by the parties.  Compare Riechmann v. State, 966 So. 2d 298, 304
n.8 (Fla. 2007) (“[I]t is axiomatic that amici are not permitted to raise new
issues.”), with People v. Hermiz, 611 N.W.2d 783, 785 (Mich. 2000)
(“Absent exceptional circumstances, amicus curiae cannot raise an issue that
has not been raised by the parties.  However, this is not a hard and fast
rule.”).  We need not decide whether and under what circumstances we will
consider an issue not raised by the parties to an appeal, however, because in
this case we decline to exercise any discretion we may have to reach such
issues.





[5] 
The trial court actually calculated the total damages associated with lost
patronage from September through December 2012 to be $101,500.  In
addition to the above finding concerning the combined drop in covers for
September to November 2012, the trial court made a separate finding that

 

When the guardrail
was put up, the covers dropped to 1923 per month for September 2012 and 2065
for October 2012.  This is approximately 1,000 [fewer] covers than for
that month in the previous year (2011) and prior to the barricade being
placed.  Each cover brings an average of $29.00, so the loss during this
time period was at least $29,000.

 

The trial court added that $29,000 to the $72,500
noted above to reach its total of $101,500.  On the one hand, the trial
court’s reasoning in this finding suggests that the losses in September and
October were $29,000 per month, so that the total for those two months
should have been $58,000, not $29,000.  On the other hand, it is clear
that the two-month period included in that calculation was also included in the
calculation of lost revenues for the September to November 2012 period. 
Thus, the addition of the $29,000 to the $72,500 (for a total of $101,500) was
error, since it double-counted the $29,000.  Because we conclude that the
evidence does not support the trial court’s calculation of damages more
broadly, this particular error is not dispositive.





[6] 
P&B argues, in response to the double-counting calculation error noted
above, supra ¶ 13 n.4, that we should affirm the additional award
as a component of its noneconomic damages.  It is true that noneconomic
damages are recoverable in a nuisance action.  Coty v. Ramsey Assocs.,
Inc., 149 Vt. 451, 464, 546 A.2d 196, 205 (1988) (noting that award of
damages for nuisance “can properly include both compensation for the lost use
of property . . . and compensation for personal injuries
such as annoyance, discomfort, and inconvenience”).  However, it is clear
from the trial court’s written findings that it based its compensatory damage
award solely on its calculation of lost revenues.  We cannot affirm the
damage award on the basis of alternate factual findings the trial court could
have made but did not.





[7]
 Such services are mostly snow removal and maintenance and repair of the
roadway and its associated ditches, culverts, and slopes.





[8]  The trial court noted that this was
part of a pattern of irregular proceedings by the board.  For example, POA
board secretary Judith Edberg testified that that any notes made at board
meetings were destroyed and that the board always made decisions by unanimous
vote.  Edberg also testified that she was not certain that POA members had
ever been given notice of a May 2012 meeting.

 

The POA also showed a pattern
of disregard for the declaration and bylaws and a history of “retroactive”
amendments attempting to ratify past actions.  For example, the POA had
four directors even while the bylaws authorized only three; the bylaws were
amended to allow up to nine directors in June 2012.  The March 18, 2012
email notification to members, sent by then-secretary Judith Edberg, stated
that the board and counsel had updated the bylaws to be consistent with Vermont
law and to “reflect the way we operate”—never mentioning the expansion of the
size of the board.  The board also routinely disregarded the provision of
the declaration of covenants requiring that the annual budget for the next year
be mailed to the membership by June 30 of each year.  Rather, the board’s
practice was to prepare and implement the budget themselves, explaining to
members at the annual meeting what had been spent the previous year, rather
than what was proposed for the next year.  Most disturbingly, the POA
officers have not paid dues to the POA since 2008—something not allowed for by
either the declaration or the bylaws.  In June 2012, the bylaws were
amended to exempt officers from paying dues, but this amendment was not
explained to members in Edberg’s March 2012 email describing the bylaws
amendments.

 





[9]
 The POA claimed that members had been informed of pending litigation in
February 2013, but the trial court noted that the minutes of that meeting
indicate only a discussion of negotiation “to avoid future legal action,” and
the notice for that meeting lacked an agenda.





[10] 
Generally, when punitive damages are sought against a corporate entity,
“ ‘the malicious or unlawful act relied upon must be that of the governing
officers of the corporation or one lawfully exercising their
authority.’ ”  Brueckner, 169 Vt. at 130, 730 A.2d at 1096
(quoting Shortle, 137 Vt. at 33, 399 A.2d at 518).





[11]
 In a June 30, 2013 order, the trial court denied P&B’s motion for
leave to file a third amended complaint.





[12]
 The POA also argued that P&B should not be awarded fees in connection
with the drafting and filing of a second amended complaint while the first
amended complaint was pending because doing so constituted excessive motion
practice and duplicative work, and that P&B should not be awarded fees for
counsel’s attendance at a post-judgment POA meeting.  The trial court
ruled against the POA on the first issue and in its favor on the second. 
On appeal, the POA has not renewed its argument that specific legal work (set
forth in its opposition before the trial court) was duplicative and excessive.





[13]
 The fact that P&B had no rights under the VCIOA in its capacity as
owner of Parcel 1 does not undermine this conclusion.  Although it did not
prevail on this particular claim, P&B argued below that its deeded access,
for the benefit of Parcel 2, encompassed the entrance across which the POA
built a guardrail.

 





[14]
 Sunne Village Lane led to No Name Road.  As noted above, there was
already an access from No Name Road on to lot 4 within Parcel 2. 
Accordingly, the trial court’s analysis of the scope of the deeded easement
focused on a scenario in which patrons of the restaurant traveled down Sunne
Village Lane to No Name Road and from there accessed Parcel 2.





[15]
 To the extent P&B appears to seek a ruling concerning other potential
commercial uses of the property, we decline to offer it.  See Sweezey
v. Neel, 2006 VT 38, ¶ 28, 179 Vt. 507, 904 A.2d 1050 (“[T]he superior
court’s ruling that the scope of the [express] easement does not include its
use as an avenue for future development is an impermissible advisory
opinion.”).  Our analysis here is limited to the question of whether use
of the deeded easement to access two operating restaurants with patron volumes
as reflected by the evidence in this case is within the scope of the deeded
easement.





[16]
 The trial court found that in July 2011, when the restaurants opened,
covers were approximately 3000 to 3100 per month.  Even assuming that some
patrons carpool, so that the actual number of cars associated with that
patronage is considerably lower, the burden of these restaurant operations is
far greater than the burden on the road easement typically associated with a
private home.