NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 77

No. 2019-387

| | |
|---|---|
| VTRE Investments, LLC | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, |
| | Civil Division |
| | |
| MontChilly, Inc. | May Term, 2020 |

Megan J. Shafritz, J.

Alexander J. LaRosa of MSK Attorneys, Burlington, for Plaintiff-Appellee/Cross-Appellant.

Russell D. Barr and Scott L. Keyes of Barr Law Group, Stowe, for Defendant-Appellant/
 Cross-Appellee.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1.     **ROBINSON, J.**    This appeal involves a dispute between neighboring property owners over the scope and enforceability of two express easements. Defendant, MontChilly, Inc., appeals the trial court's order, after an evidentiary hearing, requiring it to remove portions of a fence that interferes with plaintiff's easement for ingress and egress. It also contends that the trial court improperly failed to issue a ruling on its counterclaim for trespass against plaintiff for parking on MontChilly's property without any legal right to do so. On cross-appeal, plaintiff, VTRE Investments, LLC, challenges the court's holding that it is bound by a reciprocal easement allowing a drainpipe over its property on the ground that its predecessor in interest did not sign the instrument creating the easement. We reverse the trial court's order requiring MontChilly to

remove portions of its fence and remand for the court to enter judgment on MontChilly's trespass counterclaim. With respect to VTRE's cross-appeal, we affirm the court's judgment and remand for further proceedings in light of this holding.

¶ 2. The trial court's findings reflect that MontChilly owns commercial property on the Mountain Road in Stowe, Vermont, where it operates the Northern Lights Lodge. Michael Seaberg is the principal owner and operator of MontChilly and lives at the Lodge with his family. His property is bounded on one side by the Mountain Road and extends towards the West Branch River on the other. Several residential properties sit between the Lodge and the river, including property VTRE purchased in 2017. Nicholas Lizotte is the principal and sole member of VTRE. Before VTRE bought the property, Lizotte lived there for some time as a tenant.

¶ 3. MontChilly's property is burdened by various servitudes in favor of VTRE's property, including a right-of-way for ingress and egress from the Mountain Road over MontChilly's property to the VTRE parcel. In addition, a 2010 deed executed by Seaberg on behalf of MontChilly grants VTRE's predecessors-in-interest, the Schmidts, a sewer easement to connect the VTRE property to the municipal sewer system.[1] The deed includes a reciprocal covenant by the grantee to "provide a 4-inch diameter drain pipe running from the common boundary with the Grantor through [Schmidt's] property to the river for the purpose of diverting water flow from the sump pump(s) located within lodging facility situated on [MontChilly's] property to the river." The Schmidts did not sign the instrument.

¶ 4. Tensions between the two parties escalated following a dispute over water drainage, and VTRE sued MontChilly in July 2017. VTRE sought a declaratory judgment that MontChilly has no right to discharge water over plaintiff's property or to run hoses or other means of water

---

[1] For simplicity, we refer to the properties as the "VTRE property" and the "MontChilly property" even when referring to time periods when the properties were owned by others.

2

transport over plaintiff's property to the adjacent river.[2]  In response, MontChilly counterclaimed, alleging, among other things, that occupants of the VTRE property had intentionally trespassed by knowingly parking on MontChilly's property without any legal right to do so.

¶ 5.     In the spring of 2018, after VTRE commenced this action but before the bench trial, MontChilly built a forty-foot fence along its property line.  In response, VTRE filed an Emergency Motion to Enjoin Defendant's Modification and Landscape Work on Property in Dispute, arguing that the fence encroached on a driveway turnaround on VTRE's property.  In its motion, VTRE grounded its claim on a theory of adverse possession "and/or" prescriptive easement with respect to the turnaround area.  Following a hearing, the court declined to grant emergency injunctive relief because VTRE had not shown irreparable harm.  The court acknowledged that, viewing the evidence most favorably to VTRE, the fence blocked an area Lizotte and his guests used to turn around and park.  As a result, visitors to the VTRE property had to park on the lawn, and Lizotte and his visitors had to turn around on the lawn when they wanted to exit the property.  But the court concluded that any temporary damage to the lawn would not constitute "irreparable harm."

¶ 6.     In the context of that hearing, the court noted that VTRE had not formally pled its claims for adverse possession and prescriptive easement, although the issues were clearly in the case, and suggested that VTRE formally amend its pleadings to bring its claims "clearly into the mix."  VTRE did not amend its complaint.  At the start of the bench trial of the parties' various claims and counterclaims, VTRE's counsel disavowed its claim to the turnaround by adverse possession; in his testimony, Lizotte testified that he did not believe he had a prescriptive easement.

¶ 7.     Following the trial, but before the court issued its judgment, MontChilly filed a motion for specific performance or preliminary injunction, alleging that VTRE had dug up portions

_____

[2]  VTRE's five-count complaint sought declaratory relief with respect to a number of other alleged easement rights, and MontChilly's counterclaim likewise raised issues not germane to this appeal.  We limit our description of the parties' respective claims and the proceedings below to the matters at issue on appeal.

of the drainpipe installed across its property. According to the motion, the underground drainpipe was capped at the edge of MontChilly's property, preventing the sump pumps in MontChilly's basement from evacuating water. The court denied the motion without prejudice in May 2019 and stated that it would hold a status conference to determine whether any issues remained unaddressed after it ruled on the pending claims.

¶ 8. In its August 2019 findings and conclusions, the court ruled that MontChilly's fence interfered with "VTRE's traditionally established right-of-way" for turning around (but not for parking) and must be removed, and that MontChilly has the right to run a four-inch diameter drainpipe through VTRE's property to the riverbank area, as well as to enter VTRE's property to inspect and maintain it. The court did not directly rule on MontChilly's counterclaim for trespass based on Lizotte and his guests parking on MontChilly's property.

¶ 9. MontChilly filed a motion for reconsideration arguing, among other things, that the court's ruling that VTRE's deeded easement for ingress and egress has traditionally encompassed a turnaround area was not supported by any evidence. The court denied the motion, reiterating its finding that MontChilly's recently constructed fence "limited the traditionally open and undefined area that had been used in the past for the driveway easement." In its final judgment order, the court dismissed MontChilly's claim that VTRE occupants had trespassed by parking on MontChilly's property without a legal right to do so. The court did not address MontChilly's post-hearing claim that VTRE had interfered with its right to pipe water over the VTRE property.

¶ 10. On appeal, MontChilly challenges the trial court's order requiring it to remove the fence on the ground that it interferes with VTRE's deeded easement, and argues that the trial court improperly dismissed its trespass claim after finding that VTRE's easement did not include any right to park in the "turnaround" where VTRE occupants parked. In its cross-appeal, VTRE challenges the trial court's conclusion that VTRE's property is encumbered by an easement allowing MontChilly to run a drainpipe across its property in light of the fact that VTRE's

4

predecessor in interest did not sign the deed reflecting that covenant. We consider these respective claims below.

## I. The Fence and the Turnaround

¶ 11. MontChilly challenges the trial court's order requiring it to remove portions of its fence from the gravel turnaround area and along portions of the driveway easement on two bases. First, VTRE was not entitled to such a judgment because it never filed a pleading seeking a declaration that the easement for ingress and egress arising from a 1966 deed was wide enough for two cars and included a turnaround at the location of MontChilly's fence, and the issue was not tried by consent. Second, there is no evidence that the turnaround at issue existed on the MontChilly property prior to 2010 or that access was traditionally wide enough for two cars to pass. We consider each argument in turn.

### A. Trial by Consent

¶ 12. We conclude that even though VTRE failed to file any pleading asserting a right to ingress and egress over the area where MontChilly built a fence, the claims were tried by consent and the trial court properly reached them.

¶ 13. Although parties are generally required to identify their legal claims and specify their requests for judgment in their pleadings, courts may address issues tried by consent. See V.R.C.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). "In order to find consent for an unpleaded issue, it must appear that the injured party understood the evidence was introduced to prove the unpleaded issue." In re Waitsfield-Fayston Tel. Co., 2007 VT 55, ¶ 19, 182 Vt. 79, 928 A.2d 1219 (quotation and alteration omitted).

¶ 14. We conclude that the question of whether MontChilly's fence interfered with VTRE's easement for ingress and egress was tried by consent for several reasons. First, there is no dispute that VTRE's claim that MontChilly's fence interfered with VTRE's property rights was

5

an active issue throughout the case. Although VTRE's legal theory as to the basis for its entitlement to use the contested property as a turnaround (and to park) shifted through the course of the proceedings, its request for a judgment ordering MontChilly to remove the fence so the occupants of the VTRE property and their guests could turn around (and park) in that space was a central issue in the case. VTRE filed a motion specifically seeking removal of the fence, and in the context of a hearing on the motion the trial court acknowledged that, though it had not been properly pled, the issue was "obviously in the case."

¶ 15.     Second, both parties presented evidence and argument concerning the scope of VTRE's easement relative to the turnaround area in the contested hearing. See Kwon v. Edson, 2019 VT 59, ¶ 30, __ Vt. __, 217 A.3d 935 (identifying aggrieved party's failure to object at trial to testimony about issue not expressly pled as factor supporting conclusion that matter was tried by consent). At the outset, VTRE's counsel withdrew any claim to adverse possession and said, "[i]t's really an easement case." Lizotte likewise disavowed a prescriptive easement claim, testified that he had an easement for ingress and egress from the Mountain Road, and asserted that the placement of MontChilly's fence was "effectively rewriting the easement." MontChilly did not object to this testimony, but instead cross-examined Lizotte concerning the scope of his access rights. MontChilly's principal, Seaberg, testified that the turnaround was unnecessary for reasonable use of the easement and suggested that the only reason Lizotte needed the turnaround was that he parked too many cars on his property. Although VTRE initially staked its claim to a right to use the contested turnaround on theories of adverse possession and prescriptive easement, by the time of the trial, its focus had shifted to the deeded easement for ingress and egress as the source of its legal rights.

¶ 16.     Finally, both parties' proposed findings addressed the question. See Kwon, 2019 VT 59, ¶ 31 (concluding that inclusion of issue in both parties' proposed findings supports conclusion that it was tried by consent). VTRE's post-trial brief expressly set forth its claim that

6

MontChilly's fence unlawfully and unilaterally reduced the size and scope of VTRE's historical easement. MontChilly did not object to VTRE's inclusion of this issue either at the time or in its post-decision motion for reconsideration, which instead focused on the merits of the court's analysis with respect to the easement. Moreover, MontChilly's own post-trial memorandum acknowledged that "Mr. Lizotte claimed the installation of the fence changed the width of the access and now requires him to back up 200-300 feet to turn around," and requested that the court declare that the driveway easement "be as it appears on the ground" and in surveys from 2016 and 2018. For these reasons, we conclude that MontChilly had fair notice of VTRE's claim that its fence interfered with VTRE's deeded easement for ingress and egress.

B. Sufficiency of Evidence Concerning Turnaround

¶ 17. In its initial decision, the trial court found that a 1966 warranty deed grants VTRE a right to access the VTRE residence by traveling over MontChilly's property. It found that, while the location of the right-of-way was not defined in the warranty deed, the record evidence shows that "access was traditionally gained through a driveway area near the neighboring . . . property that was wide enough for two cars to pass each other and included a gravel turnaround near the VTRE Residence property line." The Court found that the fence encroaches, at least in part, on the driveway area "traditionally used as part of the [deeded] easement." Citing the common-law rule that the owner of a servient estate may not change the location of a right-of-way without the consent of the easement owner, the court found that MontChilly's fence effectively relocated VTRE's easement into a smaller area without VTRE's consent. See Sweezey v. Neel, 2006 VT 38, ¶ 10, 179 Vt. 507, 904 A.2d 1050 (recognizing general property law principle that "the owners of both the dominant and servient estates must consent to relocate an easement" (quotation omitted)). The court further concluded that VTRE's easement did not include the right to park in the turnaround area on MontChilly's property.

7

¶ 18. Following the court's ruling, MontChilly filed a motion for reconsideration arguing, among other things, that there was no evidence that the longstanding easement for ingress was wide enough for two cars or included the turnaround area. MontChilly pointed to testimony that the gravel turnaround was created in 2010 when the contractor who performed sewer connection work left the gravel behind, and asserted that there was no evidence of use of the area for turning around prior to 2010. The court reaffirmed its findings and noted, "It is immaterial whether the 'turnaround area' was always gravel or had been a grassy area prior to 2010. . . . There is no dispute that the open area had always existed on the property, and was not previously fenced in."

¶ 19. On appeal, MontChilly reiterates its argument that there was insufficient evidence to support the finding that the driveway traditionally included this turnaround area. Reviewing the record in light of the applicable substantive law, burden of proof, and standard of review, we conclude that the trial court's conclusion that MontChilly's fence encroaches on VTRE's deeded easement is not supported by the evidence.

¶ 20. The evidence at trial concerning the easement for ingress and egress included the following. VTRE introduced the 1966 deed establishing the easement. The deed establishes a "right to pass and travel over other land of the grantor for the purpose of ingress and egress to and from the [VTRE property], with such right to be exercised through the use of motor vehicle and similar type conveyance and pedestrian type travel." The deed does not further define the parameters of the easement. Lizotte testified that before MontChilly put up the fence, the driveway was wide enough so that two cars could pass one another without having to back up, and there was a parking area on the left side that was used to back up and turn around. He estimated the width of the driveway to be fifty feet. Because of the fence, two cars cannot pass one another on the

drive, and the parking area is no longer available to turn around.[3]  As a result, cars have to back up a hundred yards to turn around.  VTRE introduced a 2016 survey Seaberg had given Lizotte, which depicts the turnaround area as part of the land covered with gravel.  Lizotte acknowledged that he did not have firsthand knowledge as to whether the gravel turnaround had been used for a very short period of time.  Lizotte offered no evidence about the use of the access easement prior to his occupancy of the VTRE property.

¶ 21.  For MontChilly, Seaberg testified that since he came to the property in 2010, the driveway had never been wide enough for two cars to pass unless one was driving up on the lawn.  He said the driveway was approximately sixteen, maybe up to eighteen feet wide.  He testified that in 2010, there was no parking or anything else in the area of the turnaround; it was grass.  After Seaberg gave VTRE's predecessor a sewer easement, the driveway and the corner area now described as the turnaround area were torn up to facilitate the connection.  Upon completing the project, the contractor filled the driveway back with gravel; instead of filling the area now called the turnround with grass seed, the contractor dumped gravel and created a parking area.  At that point, Seaberg told Schmidt, VTRE's predecessor, that he could leave the gravel in place for now, but if people parking in the area became a problem, he would tell people to stop.  It became a problem at one point, and Seaberg told Schmidt to tell his tenants to stop parking there.

¶ 22.  These events prompted Seaberg to get a survey showing the boundaries between the two properties.  Seaberg testified that in response to a request—in late 2016 or early 2017, before Lizotte closed on the VTRE property—he gave Lizotte the survey.  When Seaberg provided the survey, he noted the turnaround area and told Lizotte it had only been added a few years ago and was not to be used for parking.  Almost immediately after Lizotte closed on the VTRE

---

[3]  In response to questions on cross-examination, Lizotte also raised questions about the boundary line, suggesting that the fence encroached on his property.  However, his counsel clarified that VTRE was not making any claim concerning the boundary line.

property, Seaberg observed multiple cars associated with the VTRE property parked on his land. He sent Lizotte texts asking him to stop parking on his land, but got no response. Seaberg testified that Lizotte had adequate space to turn cars around on his own property, and that any problems in that regard were the result of bringing more cars onto the property. Seaberg further testified that he put up the fence to protect the space for installation of a playground, and to guard against construction vehicles and dumpsters being placed on his property during an upcoming construction project involving demolition of the VTRE house. He took measures to ensure that the fence was entirely on his property, and he testified that the fence did not narrow the driveway but instead was grounded in the pre-existing lawn.

¶ 23. To determine whether a unilateral act of one party modifies an established easement, the Court must make a determination as to the scope of the express easement. See Farrell v. Vt. Elec. Power Co., 2012 VT 96, ¶ 13, 193 Vt. 307, 68 A.3d 1111 ("Whether a particular use overburdens an easement . . . depends on the easement's original purpose and the scope of its authorized use."); see also J. Bruce & J. Ely, Law of Easements and Licenses in Land § 7.6 (2020) ("The initial point of inquiry is to determine whether the instrument creating the easement adequately locates the easement and describes its dimensions."). The touchstone for interpreting the scope of an express easement is the intent of the original parties to the easement. Post and Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n, 2015 VT 60, ¶ 56, 199 Vt. 313, 124 A.3d 454. Where the intent is clearly to create a right of ingress and egress, but the language of the deed is general, "the owner of the easement is 'entitled to a convenient, reasonable, and accessible way, having regard to the interest and convenience of the owner of the land as well as their own.' " Patch v. Baird, 140 Vt. 60, 66, 435 A.2d 690, 692 (1981) (quoting LaFleur v. Zelenko, 101 Vt. 64, 70, 141 A. 603, 605 (1928)).

¶ 24. While an easement is presumed to include reasonably convenient use, the easement "must be used 'in a manner consistent with the use contemplated at the time of its creation,' and

10

may not be used 'in a way that materially increases the burden on' the property subject to the easement." Farrell, 2012 VT 96, ¶ 13 (quoting Rowe v. Lavanway, 2006 VT 47, ¶ 22, 180 Vt. 505, 904 A.2d 78 (mem.)); see also Sargent v. Gagne, 121 Vt. 1, 12, 147 A.2d 892, 900 (1958) ("It is the general rule that a way, once located, cannot be changed thereafter without the mutual consent of the owners of the dominant and servient estates."). However, the scope of a deeded easement can be expanded to account for normal changes to preserve the intended use. See Post and Beam, 2015 VT 60, ¶ 57 (explaining that the "manner, frequency and intensity of the use of [an] easement may change over time to take advantage of developments in technology and to accommodate normal development . . . if doing so would reflect the expectations of the parties who create servitudes of indefinite duration" (quotation and alterations omitted)).

¶ 25.   As the party alleging that MontChilly has encroached on its deeded easement, VTRE bears the burden of proving this claim. Cf. Patch, 140 Vt. at 66, 435 A.2d at 693 (stating that proponent of claimed easement had burden of proving where the easement was located). In assessing the sufficiency of the evidence, we view it in the light most favorable to the prevailing party and we do not set aside findings of fact unless "there is no credible evidence to support the findings." Okemo Mountain, Inc. v. Lysobey, 2005 VT 55, ¶ 8, 178 Vt. 608, 883 A.2d 757. The court's findings may be based on reasonable inference, but cannot rise to the level of speculation. Kwon, 2019 VT 59, ¶ 26.

¶ 26.   Applying these standards, we conclude that there is insufficient evidence to support the court's findings that the easement historically included a turnaround area to enable cars to turn around on the MontChilly property. Even assuming the court credits only those aspects of Seaberg's testimony that are helpful to VTRE, at most the court received evidence that the driveway has included a gravel-covered turnaround area since 2010, and that, per Lizotte's testimony, occupants and guests of the VTRE property have used the turnaround to turn around their cars since he began living at the property in July 2016. VTRE offered no evidence that

11

VTRE's predecessors routinely turned their cars around on the contested area of MontChilly's property, or that a turnaround existed, covered with gravel or not, prior to 2010.[4] VTRE is not necessarily required to provide historical evidence dating back to the 1966 deed to establish the scope of the deed, but the limited evidence of very recent use of the driveway is insufficient to meet VTRE's burden to establish that MontChilly has encroached on the deeded easement as historically understood.

¶ 27. Likewise, with respect to the width of the easement, neither party purported to offer precise evidence. Lizotte testified that before MontChilly put up the fence, the driveway was fifty feet wide, extending all the way to the pool. He offered no evidence that two cars could pass each other within the easement beyond his personal experience since living on the VTRE property for a little over two years. He offered no physical evidence on the ground, nor evidence of historical usage to support an inference as to the width of the easement as historically understood by the owners of the dominant and servient parcels. Although there may be some minimum width that is necessary to ensure a "convenient, reasonable, and accessible way," see Patch, 140 Vt. at 66, 435 A.2d at 692, VTRE did not show, and the court did not find, a minimum width necessary to satisfy this requirement, Cf. 24 V.S.A. § 4412(3) (describing minimum width of permanent access easements for development subject to zoning regulation). For these reasons, we conclude that the trial court's finding that MontChilly's fence encroached on VTRE's access easement is not supported by the evidence, and we reverse the trial court's judgment that "MontChilly's fence, as presently constructed, encroaches on and limits VTRE's driveway easement and must be moved or removed."

---

[4] MontChilly called as a witness the owner of the MontChilly property from 1998 to 2010. This witness testified that the occupants of the VTRE property did not park on the MontChilly property. Although this witness presumably could have provided historical perspective dating back more than another decade, neither party asked this witness about the width of the driveway or use of the MontChilly property for turning around.

## II.  The Drainage Pipe Easement

¶ 28.   On cross-appeal, VTRE contests the trial court's conclusion that the 2010 Deed of Easement grants MontChilly the right to run a four-inch inground drainage pipe across VTRE's property on the ground that the deed was not signed by VTRE's predecessor.  Whether the drainage pipe easement is enforceable is a question of law that we review without deference.  Miller v. Flegenheimer, 2016 VT 125, ¶ 11, 203 Vt. 620, 161 A.3d 524 (stating that existence of enforceable contract is matter of law reviewed without deference).

¶ 29.   The 2010 Deed of Easement grants VTRE's predecessor in interest, Schmidt, a sewer easement  to allow him to connect to the Stowe town sewer.  The deed also states:

> Grantees also covenant and agree to provide a 4-inch diameter drain
> pipe running from the common boundary with the Grantor through
> Grantee's property to the river for the purpose of diverting water
> flow from the sump pump(s) located within lodging facility situated
> on Grantor's property to the river.

Seaberg, as grantor with respect to the sewer easement, signed the 2010 Deed of Easement but the Schmidts, as grantees, did not.

¶ 30.   Pursuant to that deed, Schmidt installed the four-inch inground drainage pipe to connect MontChilly's sump pump to the river through what is now VTRE's property.  According to Seaberg, Schmidt voluntarily maintained the drainpipe while he was the owner of that property.

¶ 31.   Because the 2010 Deed of Easement was not signed by the Schmidts, VTRE argued in the trial court that it fails to meet the requirements of the Statute of Frauds, and that he is not required to allow MontChilly's drainage pipe to cross his land.  The court rejected this argument, concluding that the Statute of Frauds was satisfied upon Mr. Schmidt's acceptance of the deed and that the drainpipe easement is therefore enforceable against VTRE.  The court explained that Mr. Schmidt clearly intended to be bound by the deed, and noted that he received the benefit of the reciprocal sewer pipe easement in exchange for this obligation.

13

¶ 32. Before the court issued these findings, however, MontChilly filed an emergency motion for specific performance, alleging that VTRE unilaterally removed the four-inch drainpipe from its property. MontChilly asked the court to order VTRE to restore the pipe, which was capped on the edge of its property, preventing the sump pumps in MontChilly's basement from evacuating water. The court never ruled on the motion.

¶ 33. In this appeal, MontChilly asks the Court to remand the matter for a ruling by the trial court on MontChilly's request for specific performance. On cross-appeal, VTRE renews its contention that the Statute of Frauds bars enforcement of the drainpipe covenant in the 2010 Deed of Easement.

¶ 34. We hold that the 2010 Deed of Easement granting the Schmidts sewer access binds VTRE to the reciprocal drainpipe easement contained within the deed, despite the fact that the Schmidts did not sign the instrument. Because the instrument executed in this agreement did not purport to require the signature of the grantees, it is considered a deed poll. As explained in further detail below, while the term "deed poll" is somewhat antiquated in Vermont, such deeds are nevertheless recognized and valid. The modern trend is to treat reciprocal covenants by grantees in deeds polls binding on grantees who accept the deeds. The principle of estoppel further supports our conclusion that affirmative reciprocal obligations contained in deeds poll are enforceable against grantees who accept the deeds, even when they have not signed them. The authority relied on by VTRE in its attempt to distinguish this case from those where acceptance does not bind the grantee is unpersuasive. We therefore remand for consideration of MontChilly's motion for specific performance in light of this ruling.

¶ 35. A deed poll is a term referring to a conveyance executed unilaterally and sealed exclusively by the grantor. See Restatement (Third) of Prop.: Servitudes § 2.1 cmt. b (2000). The deed poll gets its name from the term 'polled,' in the sense of the flat head of an animal whose horns have been removed. See 1 Williston on Contracts § 2.7 (4th ed. 2020) (citing 2 Blackstone

Comm. 295); <u>Polled</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/polled [https://perma.cc/LTA3-RQFG] (defining "polled" as "having no horns"). In the ancient common law, a deed executed unilaterally by one party was flat at its top, or <u>polled</u>, while deeds executed by two parties were cut in a wave along their center, creating a teeth-like pattern. See <u>id</u>. The term used to describe these bilaterally executed agreements was "indenture," derived from the Latin phrase for "like teeth," as the jagged edge on the parchment was "cut or indented in a toothlike manner, similar to that of a saw." See <u>id</u>.

¶ 36. In Vermont, deeds poll have been recognized by common law, although overt reference to them ended in the early twentieth century. See, e.g., <u>Blake v. Tucker</u>, 12 Vt. 39, 45-46 (1840) ("It is no doubt true, that the grantor in a deed poll, and, to some extent, all who claim title under him, are bound by recitals in the deed."). This Court's last reference to a deed poll involved a dispute over the sale of a home farm in Orange County, in which the instrument in question was briefly and anecdotally referred to as a "deed (poll)" without further discussion. <u>Maidment v. Frazier</u>, 90 Vt. 520, 526, 98 A. 987, 989 (1916). The term "deed poll" has dropped out of the modern lexicon, but the instrument it references remains commonplace. Restatement (Third) of Prop.: Servitudes § 2.7 cmt. g (2000) ("The standard deed used in American practice is a deed poll, which is signed only by the grantor."). Although this Court has long recognized the enforceability of deeds poll, we have not directly considered whether reciprocal obligations in a deed poll that burden the property of the grantee are enforceable even though the grantee has not signed the instrument.

¶ 37. The modern trend among states that have considered the issue is to enforce such reciprocal covenants. At common law, deeds poll could not bind a grantee to obligations contained within because the instrument, by its design, was not sealed by the grantee. See 17 F. Dana, S.C. Jur. Covenants § 7 (2020). The overwhelming modern trend recognizes the acceptance of a deed poll as creating a binding agreement on the part of the grantee and successors to the

15

obligations of the deed, regardless of whether the grantee has signed the instrument. See id. ("Early South Carolina cases were in accord [with the common law]. Currently, however, this rule has been abandoned and South Carolina courts have enforced restrictions created in deeds signed by the grantor only, usually without discussing the point."); see also Fort Dodge, D.M. & S. Ry. v. Am. Cmty. Stores Corp., 131 N.W.2d 515, 522 (Iowa 1964) ("The voluntary acceptance of a deed poll binds the grantee to the performance of covenants contained therein."); Johnston v. Mich. Consol. Gas Co., 60 N.W.2d 464, 467 (Mich. 1953) ("As a rule the grantee by accepting a deed poll [is bound] to covenants therein contained."); Barrier v. Randolph, 133 S.E.2d 655, 658 (N.C. 1963) ("[I]t is a settled principle of law that a grantee who accepts a deed poll containing covenants or conditions to be performed by him as the consideration of the grant, becomes bound for their performance, although [the grantee] does not execute the deed as a party." (quotation omitted)); Hunt v. Curry, 282 S.W. 201, 205 (Tenn. 1926) ("Although the conveyance from [grantor] to [grantee] was by deed poll, nevertheless the covenants are binding on a grantee who accepts the benefits of such a deed.").

¶ 38. The doctrine of estoppel supports the modern rule that reciprocal covenants in deeds poll are binding against grantees upon acceptance even though they have not signed them. The Statute of Frauds, codified at 12 V.S.A. § 181, requires a contract for the sale of an interest in land to be signed by the party against whom it is enforced. However, where one party has detrimentally relied on the promises made by the other, the doctrine of equitable estoppel permits enforcement of a contract that otherwise fails the Statute of Frauds. See Restatement (Third) of Prop.: Servitudes § 2.9 ("The consequences of failure to comply with the Statute of Frauds . . . do not apply if the beneficiary of the servitude, in justifiable reliance on the existence of the servitude, has so changed position that injustice can be avoided only by giving effect to the parties' intent to create a servitude."); My Sister's Place v. City of Burlington, 139 Vt. 602, 609,

16

433 A.2d 275, 279 (1981) (holding that doctrine of equitable estoppel grants relief to parties who have acted in good faith and "changed [their] position in reliance upon earlier representations").

¶ 39. Here, the Schmidts accepted the deed poll. They received the right to run a sewer line across MontChilly's property, at least in part in exchange for allowing MontChilly to run a drainpipe across theirs. On the basis of the authority above, we hold that the 2010 Deed of Easements created a binding obligation on VTRE's predecessor to allow the drainpipe easement.

¶ 40. This case is distinguishable from Jokay, Inc. v. Lagarenne, a case relied upon by VTRE. 525 N.Y.S.2d 411 (App. Div. 1988). In that case, the parties' deed failed the Statute of Frauds for lack of the grantee's signature. The provisions of the deed required the grantee to act as grantor in part by providing an easement to the grantor in partial exchange for conveyance of land. Jokay is distinguishable from this case in at least two ways. First, the court's analysis suggests that the deed at issue was written in a way that anticipated a signed express grant of the reciprocal easement, whereas here, the 2010 deed poll did not require the Schmidts' seal. See id. at 414 ("Since [grantee] did not sign this deed, an easement by express grant, as anticipated by the language utilized, could not have been created."). By their very nature, deeds poll do not call for the signature of the grantee, and therefore the deed at issue here required only MontChilly's signature. Second, the court found, in contrast to this case, no evidence of part performance or reliance such as to create an easement by estoppel. Id.

¶ 41. For the reasons set forth above, we affirm the trial court's holding that the drainpipe easement is enforceable against VTRE and remand for consideration of MontChilly's motion for specific performance in light of this ruling.

### III. The Parking Trespass Counterclaim

¶ 42. In response to VTRE's complaint for declaratory judgment, MontChilly made several counterclaims, including a claim that VTRE committed trespass by parking its vehicles on the gravel turnaround area beside the driveway easement.

17

¶ 43.    In its Findings, Conclusion, and Order, the trial court found that the driveway easement does not give VTRE the right to park its vehicles on the turnaround, and found that Lizotte and occupants of the VTRE property sometimes parked their cars in the turnaround area. It did not otherwise directly address MontChilly's counterclaim for parking trespass. It did rule that MontChilly had failed to prove necessary elements of its counterclaims for trespass and nuisance <u>relating to stormwater runoff and trash disposal</u>.[5]  In its judgment order, the court stated, "MontChilly's counterclaims for trespass and nuisance were not proven and are hereby dismissed." The court did not distinguish among MontChilly's various trespass claims in its judgment order.

¶ 44.    On appeal, MontChilly argues that the trial court erred in failing to rule on this claim. We agree. "Where a trial court has failed to resolve a claim made to it, the proper remedy is for us to remand." <u>Lewis v. Cohen</u>, 157 Vt. 564, 572, 603 A.2d 352, 356 (1991).  Although the court made relevant findings concerning the parking trespass claim, it did not resolve that claim in its Findings, Conclusion, and Order, and we infer that the general dismissal of MontChilly's trespass claims in the judgment order was directed only at those claims resolved by its prior order. We accordingly remand for resolution of MontChilly's parking trespass claim.

<u>We reverse the order requiring MontChilly to remove its fence, affirm the trial court's judgment that VTRE is bound by the easement for a four-inch drainpipe, and remand for resolution of MontChilly's parking trespass counterclaim and motion for specific performance regarding the drainpipe.</u>

FOR THE COURT:

_____
Associate Justice

---

[5]  These claims are not among the subjects of this appeal.

18