Filed 05/28/26

VERMONT SUPERIOR COURT
Grand Isle Unit
3677 US Rt. 2
North Hero, VT 05474
802-372-8350
www.vermontjudiciary.org



CIVIL DIVISION
No. 24-CV-01480

---

**James Senesac v. Bryan Muir and Denise Muir**

---

### BENCH TRIAL DECISION

This Court held a bench trial on February 20, 2026. Plaintiff James Senesac ("Mr. Senesac") appeared through counsel, Pietro Lynn, Esq., and Hans Lynn, Esq. Defendants Bryan and Denise Muir ("the Muirs") appeared through counsel, Liam Murphy, Esq. The Court heard testimony from Mr. Senesac James Senesac, Defendants Bryan Muir and Denise Muir, James Senesac, Sr. (Plaintiff's father), and Roger Gaboriault (the prior owner of Defendants' property), who appeared virtually. Having considered the testimony, the admitted exhibits, and the parties' memoranda, the Court makes the following findings and conclusions.

### Findings of Fact

The parties dispute the ownership of a right of way known as Senesac Place and the interpretation and enforceability of the language limiting the use of the right of way for "farm purposes." Mr. Senesac resides at and owns land at 1795 West Shore Road, Isle La Motte, Vermont. His property abuts the private road known as Senesac Place, but he accesses West Shore Road directly—his ingress and egress do not depend on Senesac Place. Mr. Senesac's property derives from a chain of title entirely separate from Senesac Place, which is part of the former "Reed Farm" chain of title. Mr. Senesac's current property has never benefited from a deeded easement over Senesac Place. Ex. Q.

The Muirs own a more than 80-acre property at 30 Senesac Place, Isle La Motte, Vermont (the "Farm Parcel"). The Farm Parcel consists of pastureland, forestland, and a farmhouse. Exs. A–F, P. It is part of the former "Reed Farm" chain of title.

The dispute traces to an October 1966 Warranty Deed in which members of the LaBombard family sold Mr. Senesac's parents, James J. Senesac, Sr., and June Senesac, a 100-by-300-foot parcel from the former "Reed Farm." Ex. 1; Ex. R. The 1966 Deed specifically granted the following:

> A lot of land, being a portion of the farm once known as the "Reed Farm," 100 ft. by 300 ft. with no buildings thereon that is bounded and described as starting at an iron pipe marking the southeast corner of premises belonging to Stanley Charles and running in a northerly direction along the easterly boundary of said Charles property and property of Anthony Airtens, Oscar LaBombard and Joe Levay a distance of 300 ft. to an iron stake marking said Levay's northeast corner; thence turning an angle and running in an easterly direction a distance of 100 ft. along

the southerly line of property belonging to Maynard LaBombard to an iron stake; thence turning an angle and running in a southerly direction along the westerly boundary of property of said Grantors and parallel with the first mentioned boundary a distance of 300 ft. to an iron stake; thence turning an angle and running in a westerly direction a distance of 100 ft. to the place of the beginning.

That deed included two rights of way below the above section. Paragraphs 2 and 3 provided:

Also granted is a 20 foot right of way from the so-called West Shore Road east along the south end of the premises conveyed and premises of Stanley Charles. The grantors, their, executors, administrators and assigns have the right to the joint use of this right of way for farm purposes only."

Also conveyed is the westerly extension of the 20 foot right of way on the west side of West Shore Road to the low water mark of Lake Champlain.

Ex. 1.

In 1968, the LaBombards sold Mr. Senesac's parents an additional 300-by-50-foot parcel adjoining the 1966 parcel. Together, these two parcels formed a combined 300-by-150-foot parcel (the "Benefited Parcel"). Ex. R.

The 1968 deed also addressed any doubt about the two rights of way in the 1966 deed. It stated:

The Grantors, in order to remove any doubt as to the title of the Grantees herein, do hereby affirm and declare that the "westerly extension of said 20 foot right of way" described in paragraph #3 of their Warranty Deed to the Grantees herein dated October 21, 1966 and recorded in Book 12, Page 80 of the Isle LaMotte Land Records was intended by them to be and was conveyed in fee simple and *should not be construed as being a mere right of way as described in #2 of the above said Warranty Deed.*

Def. Ex. 17 (emphasis added). Paragraph #2 refers to the Right of Way at issue here.

Over time, Mr. Senesac's parents conveyed all land comprising the Benefited Parcel in four deeds to third parties. Ex. R.

Mr. Senesac's parents conveyed the Southerly 1/3 to Harold and Ethel LaMountain in 1967 and 1968 (Southerly Deeds 1 and 2). The Southerly Deed 1 provided: "Also conveyed herewith in common with others is a 20-foot right of way from the so-called West Shore Road leading both east and west as described in the aforementioned deed from [LaBombard]." Ex. R. The Southerly Deed 2 similarly conveyed "the right to the use in common with others to the right of way described and referred to above." Ex. R.

Mr. Senesac's parents conveyed the Northerly 1/3 to Kenalene R. Daniels in December 2005 (Northerly Deed) and the Middle 1/3 to Heather Lynn Kohser and Carol Eileen Lynch in June 2006 (Middle Deed). Both deeds stated: "Included in this conveyance and reserved by the Grantors is a right of way for ingress and egress along an existing 22-foot right of way from West Shore Road to the private road mentioned above. This 22-foot right of way extends easterly from West Shore Road and westerly to Lake Champlain." Ex. R. Neither deed imposed a farm-purposes restriction on the grantees' use of the Right of Way.

By 2006, Mr. Senesac's parents had divested all land within the Benefited Parcel.

In approximately 2000, before he conveyed the middle and northern lots, James Senesac, Sr. asked William Robenstein to prepare a survey. The Robenstein survey labeled what is now Senesac Place "Existing 22 foot Right of Way." Ex. H-1, H-2.[1] It showed the Right of Way connecting to the Farm Parcel in the rear and disconnected from any of the Benefited Parcels. The Town Tax Maps likewise reflect that the Right of Way is located within the Muir Farm property. Ex. H-1, H-2

In December 2008, Mr. Senesac's father executed a Quit Claim Deed to Mr. Senesac. Ex. 3. That deed conveyed to Mr. Senesac an enhanced life estate in:

> the right to use, in common with others, the twenty-foot right of way now known as Senesac Place, which right of way runs easterly from West Shore Road . . .

Ex. 3. Both Mr. Senesac and his father testified that they intended the 2008 deed to convey the Right of Way parcel itself.

Roger and Angela Gaboriault purchased the Farm Parcel in 2016. They farmed the land, growing and cutting hay and raising cattle. In approximately 2019–2020, the Gaboriaults constructed a farmhouse on the Farm Parcel. Ex. R.

Mr. Senesac, a building contractor, worked on the farmhouse. He personally performed or oversaw decking, roofing, and sheetrock work, and he engaged subcontractors for flooring and other elements. The Gaboriaults paid Mr. Senesac in cash for his labor and the subcontractors' work.

Mr. Gaboriault testified that when the Gaboriaults purchased the Farm Parcel in 2016, Mr. Senesac immediately claimed permanent hunting rights on the farm but did not mention the farm-purposes covenant on the Right of Way. When Mr. Senesac and Mr. Gaboriault later discussed the covenant, Mr. Senesac characterized the intent of the phrase "farm purposes" to prevent subdivision of the Farm Parcel. Mr. Senesac did not express to Mr. Gaboriault that the covenant barred access to a farmhouse.

The Gaboriaults knew of the "farm purposes" covenant but believed a farmhouse fell within its scope. Mr. Senesac never raised the farm-purposes covenant during the permitting

---

[1] There is no evidence before the Court explaining why the description went from 20-feet to 22-feet, and this issue was not raised by the parties.

process or at any point during construction. This includes the time period when construction/ delivery vehicles were using the Right of Way to construct the house.

Mr. Senesac visited the completed farmhouse many times. He and Mr. Gaboriault maintained a friendly relationship throughout the Gaboriaults' ownership. At no time during the seven years the Gaboriaults owned the property—including during construction and their subsequent years of residence—did Mr. Senesac tell the Gaboriaults that their access over the Right of Way violated the "farm purposes" covenant.

Mr. Senesac testified that he did not object to the Gaboriaults' construction because he did not believe he could control what they did on their own property. The Court did not find this credible because it ignored the necessary use of the Right of Way by delivery and construction vehicles during construction of the home.

The Gaboriaults occupied the farmhouse as their residence for several years until they sold the Farm Parcel to the Muirs in July 2023.

The Farm Parcel was listed for sale as a "farm" with an "energy efficient farmhouse." Ex. 11. The Seller's Property Information Report listed the use as a "Farm." Ex. 12. The listing contained only a non-public remark noting access was limited to farm purposes. Ex. 11 at 2. The Gaboriaults did not disclose the farm-purposes covenant to prospective buyers in any public listing materials.

Bryan Muir testified that he and his wife planned to retire and had searched for a farm property since 2018, looking in Vermont, New Hampshire, and Maine. They instructed their real estate agents to find a farm with at least 20 acres.

Before the sale closed, the Muirs' real estate agent reported to the Muirs that the sellers' agent mentioned a man on a tractor had yelled, "I'm going to make sure they keep it in farm use." The Muirs were not concerned by this statement because they intended to farm the property. No one communicated that this statement related to a claimed restriction on accessing the farmhouse.

Mr. Senesac claimed he spoke with Attorney Michael Gawne before the Muir purchase. Attorney Gawne represented the sellers, not the Muirs. Mr. Muir testified he was never informed of any such communication.

The Muirs first learned of the "farm purposes" covenant from their title attorney, who advised them that their use of the Right of Way would fall within "farm purposes" so long as they used the property as a farm. The Muirs did not testify that they knew of a "dispute" about the Right of Way before closing. Mr. Muir testified he did not recall executing a "hold harmless agreement" related to property access.

The Muirs purchased the Farm Parcel in July 2023 and immediately occupied the farmhouse. The 2023 Warranty Deed that conveyed the property to the Muirs described the Farm Parcel as:

Parcel B: A parcel of land containing 85 acres, more or less, situated on the easterly side of West Shore Road, and accessed thereto over a strip of land, extending over the easterly side of said highway to the northerly side of said parcel of land; use of which is restricted to farm purposes.

Ex. 13 at 1.

Ms. Muir lived on the property continuously between July and September 2023. During that initial period, Ms. Muir encountered Mr. Senesac on the road; they chatted about lake access and fishing. Mr. Senesac said nothing about any restriction on using the Right of Way to reach the farmhouse.

In September 2023, the Muirs received the first communication from Mr. Senesac's counsel—a letter asserting that Mr. Senesac owned the Right of Way, that the easement was limited to farm purposes, and that there was "no general right to drive motor vehicles to access your property for residential purposes." The letter offered to expand the existing right "in exchange for a payment." This was the first time the Muirs heard anyone claim their access to the farmhouse was restricted. The Muirs refused, taking the position that they did not need Mr. Senesac's permission to use the Right of Way as they intended.

When the Muirs purchased the Farm Parcel, it consisted of the farmhouse, a barn, a henhouse, open hay fields, and woodland. Ex. F. The Muirs immediately began preparing the property for active farming. They enrolled it in Vermont's Current Use program. Ex. J. They engaged a professional forester who created a Forestry Management Plan for the woodland. Ex. K. They entered a five-year lease with a local farmer to hay the meadows; haying took place in both 2024 and 2025. Ex. F, J.

The Muirs also purchased farm equipment. Ex. I-1, I-2, I-3, L. They plan to plant an orchard and a market garden and intend to raise pheasants, sheep, and rabbits once they retire to the property full-time. Ex. I. Mr. Muir testified that the cost of this litigation has delayed some of these plans. The Muirs' intent is to retire to the farmhouse and operate the farm as their primary occupation.

Mr. Muir testified that if the Muirs had known anyone disputed their right to live in the farmhouse, they would not have purchased the property at the price they paid, and likely would not have purchased it at all.

The Muirs use the Right of Way for daily vehicle traffic, grocery trips, friends and family visits, delivery trucks, and general residential ingress and egress. Ex. 16. The owners of three parcels sold by Mr. Senesac, Sr., use the Right of Way for residential purposes.

Neither Mr. Senesac nor his father ever granted the Muirs, or any prior owner of the Farm Parcel, permission to use the Right of Way as a residential driveway.

## Conclusions of Law

### I. Plaintiff Lacks Standing

For a court to have jurisdiction, the plaintiff must have standing. To have standing, the plaintiff must "show (1) injury in fact, (2) causation, and (3) redressability." *Brod v. Agency of Nat. Res.*, 2007 VT 87, ¶ 9 (quoting *Parker v. Town of Milton*, 169 Vt. 74, 77 (1998)). To have standing to bring a claim regarding a property, the plaintiff must have some cognizable legal right in the property to have been injured. Mr. Senesac lacks standing to enforce the easement because he does not own the Right of Way and is not benefited by it.

Mr. Senesac claims he owns the Right of Way in fee simple and therefore may enforce the covenant as a property owner. The Muirs respond that the 1966 deed granted Mr. Senesac's parents only an appurtenant easement, that the easement passed with the Benefited Parcel when Mr. Senesac's parents conveyed that parcel to third parties, and that Mr. Senesac currently holds no enforceable interest.

The Court begins with the deed's plain language. "Our master rule in construing a deed is that the intent of the parties governs. In ascertaining intent, we must consider the deed as a whole and give effect to every part contained therein to arrive at a consistent, harmonious meaning, if possible." *Brault v. Welch*, 2014 VT 44, ¶ 11 (quoting *DeGraff v. Burnett*, 2007 VT 95, ¶ 20). A deed term is ambiguous only if reasonable people could differ as to its meaning. *Id.*

The 1966 Deed addressed three parcels of property and used distinct verbs for those parcels. In the introduction to Paragraph 1, the deed states grantors "GIVE, GRANT, SELL, CONVEY AND CONFIRM" the land described in Paragraph 1. Paragraph 2 "granted" a "20 foot right of way" running east from West Shore Road. Paragraph 3 "conveyed" the "westerly extension" of that right of way running west to Lake Champlain. A right of way "is generally defined as a right of passage over another person's land." *Hunsdon v. Farrar*, 128 Vt. 410, 414 (1970). A right of way is generally considered "a type of easement." *Gladchun v. Eramo*, 2023 VT 5, ¶ 4 n.3. An easement, in turn, is "an interest in land consisting in the right to use or control the land . . . for a specific limited purpose." *Id.* ¶ 11 (quoting *Wagner v. Crossland Constr. Co.*, 840 N.W.2d 81 (N.D. 2013)).

The original parties' use of different words in such close proximity suggests a different intent for each strip. Standing alone, this distinction creates ambiguity. "If ambiguity exists, however, the 'interpretation of the parties' intent becomes a question of fact to be determined based on all of the evidence - not only the language of the written instrument, but also evidence concerning its subject matter, its purpose at the time it was executed, and the situation of the parties.'" *DeGraff v. Burnett*, 2007 VT 95, ¶ 20 (quoting *Main St. Landing, LLC v. Lake St. Ass'n, Inc.*, 2006 VT 13, ¶ 7). The 1968 deed between the same parties and the survey obtained by Mr. Senesac Sr. 25 years ago remove any doubt.

Extrinsic evidence resolves any confusion regarding the two rights-of-way. The 1968 LaBombard deed stated that the westerly extension described in Paragraph 3 of the 1966 deed "was intended by them to be and was conveyed in fee simple and *should not be construed as*

*being a mere right of way as described in #2 of the above said Warranty Deed.*" Ex. 17 (emphasis added).

This language draws an explicit line. The westerly extension was fee simple. The eastbound Right of Way described in Paragraph 2 was "a mere right of way," an easement.

Other extrinsic evidence confirms this reading. The Robenstein survey, prepared for Mr. Senesac, Sr., around 2000, labeled the strip "Existing 22-foot Right of Way" and did not depict Mr. Senesac's father as a fee owner. Had Mr. Senesac, Sr., thought that was a mistake, he could have asked Mr. Robenstein to fix it. The Court notes that Mr. Senesac, Sr., testified during the hearing that he believed he had owned the Right of Way. The Court found the survey prepared for Mr. Senesac, Sr., over 25 years ago more persuasive than his current testimony.

Mr. Senesac, Sr.'s testimony that he and the LaBombards understood him to own the Right of Way in fee does not overcome the documentary record. The deeds speak for themselves, and the 1968 clarification deed is dispositive.

Now that it's been established that the ownership interest granted to Mr. Senesac was an easement, not fee simple, the Court moves to whether Mr. Senesac now owns any rights to the easement.

The parties agree that whatever right of way and restrictive covenant were conveyed in 1966 are appurtenant and runs with the land. Pl. Memo at 14; Def. Memo at 11. Critically, "an appurtenant benefit may not be severed and transferred separately from all or part of the benefited property." Restatement (Third) of Property: Servitudes § 5.6 (2000); see *Nordlund v. Van Nostrand*, 2007 WL 5313317, at *3 (Vt.).

The Right of Way easement served the Benefited Parcel—the 300-by-150-foot parcel Mr. Senesac's parents acquired in 1966 and 1968. Without the Right of Way, those lots had no access to West Shore Road. The easement was appurtenant to that land.

By 2006, Mr. Senesac's parents had conveyed the entire Benefited Parcel to third parties. The appurtenant easement traveled with those conveyances. By the time Mr. Senesac's father executed the 2008 Quit Claim Deed, he held no property interest in the right of way – as discussed above, he did not own the Right of Way itself, and he no longer owned any dominant-estate land to which the easement attached. Mr. Senesac, Sr., therefore had no easement interest to convey, and the 2008 deed could not transfer to Mr. Senesac what his father no longer possessed. See *Nordlund*, 2007 WL 5313317, at *3 ("An appurtenant easement is incapable of an existence separate from the dominant estate, and any attempted severance from the dominant estate must fail.").

In sum, Mr. Senesac does not own the Right of Way in fee, and all property which benefited due to the covenant in the 1966 Deed has been conveyed away. Even accepting Mr. Senesac's argument that his property abuts the Right of Way and that increased traffic affects him, proximity alone does not confer standing to enforce a covenant in someone else's deed. To

enforce a restrictive covenant, a party must hold a legal interest in the burdened or benefited property. See *Rogers v. Watson*, 156 Vt. 483, 487 (1991). Mr. Senesac holds neither.

As such, Mr. Senesac lacks standing, and this Court lacks jurisdiction. *Brod*, 2007 VT 87, ¶ 2. Mr. Senesac's claims must be dismissed.

## II. A Farmhouse Falls Within Farm Purposes Only

If Mr. Senesac had standing, the Court would need to interpret the phrase "farm purposes only" as it limits the use of the Right of Way. The Court analyzes that phrase below as an alternative basis for denying relief to Mr. Senesac.

"The interpretation of an express easement is a question of law." *Gladchun v. Eramo*, 2023 VT 5, ¶ 12 (quoting *Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n*, 2015 VT 60, ¶ 56. The essential question when looking at a deed regarding an easement is the intent of the parties when they created the easement. *Id*. (quoting *VTRE Invs., LLC v. MontChilly, Inc.*, 2020 VT 77, ¶ 23).

The parties to the 1966 deed created the right-of-way easement. Courts begin with the plain language of the deed, as that is generally the best way to find the intent of the parties. *Id*. (quoting *Kipp v. Chips Est.*, 169 Vt. 102, 105). A court will implement the plain language if the deed is not ambiguous. Ambiguity exists when reasonable minds could differ on the meaning.

The 1966 deed states that the grantors and their assigns "have the right to the joint use of this right of way for farm purposes only." The deed does not define "farm purposes." The question concerns whether "farm purpose only" includes residential access to a farmhouse currently on the property of the successor in title of the grantor. Farm means "to cultivate land; to conduct the business of farming." Black's Law Dictionary, *Farm* (12th ed. 2024). Purpose means "an objective, goal, or end; specif., the business activity that a corporation is chartered to engage in." Black's Law Dictionary, *Purpose* (12th ed, 2024). In the context of the right-of-way, it means the road may only be used to carry out the objective of cultivating the land on the property.

The definition of farm purposes could reasonably include housing to facilitate land cultivation, since farming requires someone to work the land. However, reasonable people could also interpret that phrase to mean only the actual cultivation of the land. Given these two reasonable interpretations, the Court finds the language ambiguous and resorts to extrinsic evidence to discern its meaning.

"When a covenant is ambiguous, the question of what the parties intended to prohibit is a question of fact to be determined on all the evidence." *Mann v. Levin*, 2004 VT 100, ¶ 15. "The court must give effect to the intention of the parties if it can be gathered from the language used when interpreted in connection with, and in reference to, the subject matter and purpose sought to be accomplished at the time the instrument was executed." *Id.* (quoting *McDonough v. W.W. Snow Constr. Co.*, 131 Vt. 436, 441 (1973)).

While the Court looks first to the circumstances at the time of the covenant's creation, it also considers how the easement may reasonably adapt to changed conditions. An easement "may be adapted and reasonably expanded to preserve the intended use." *VTRE Invs., LLC v. MontChilly, Inc.*, 2020 VT 77, ¶ 24 (citing *Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n*, 2015 VT 60, ¶ 57). The intended use of the Right of Way was to allow what was necessary to tend to and cultivate the farm on the Farm Parcel. In 1966, that meant hay wagons and cattle because the LaBombards had a home on a different nearby parcel. But this fact is not dispositive, especially in light of other parties' use of the Right of Way for residential purposes and Mr. Senesac's statements to Mr. Gaboriault that the restriction was intended to prevent subdivision, not the construction of one home.

The definition of "farm" under Vermont law is broad. A "farm" is "a parcel of land devoted primarily to farming," and "farming" includes "the cultivation or other use of land for growing food, fiber, Christmas trees, maple sap, or horticultural and orchard crops" as well as "the raising, feeding, or management of livestock, poultry, fish, or bees." 10 V.S.A. § 6001(22), (31). The Muirs' activities, leasing pastureland for haying, enrolling in Current Use, obtaining a Forestry Management Plan, purchasing farm equipment, and planning to raise livestock and cultivate an orchard, fall squarely within this statutory definition.

A farmhouse serves the farmer. Other jurisdictions have recognized that housing the person who farms the land is inherently related to the farm's purpose. See *Blauvelt v. Bd. of Cnty. Comm'rs of Leavenworth Cnty.*, 227 Kan. 110, 114, 605 P.2d 132 (1980) (holding that on a farm-owner-occupied farm, "the home of the farmer" falls within "agricultural purposes"); *Byrd v. Stringer*, 295 Or. 311, 666 P.2d 1332 (1983) (holding that a property with a dwelling unit still serves "farm use" so long as the land can still be farmed profitably). The Muirs do not own any other property nearby. Without a residence on the Farm Parcel, farming the land would be impractical, if not impossible.

Vermont courts also construe covenants narrowly and "do not lightly read implied terms into deeds that restrict the scope of ownership." *Rawley v. Heymann*, 2023 VT 64, ¶ 11; *Creed v. Clogston*, 2004 VT 34, ¶ 17 ("restrictions will not be extended by implication to include anything not clearly expressed, and doubts must be resolved in favor of the free use of land"). Reading "farm purposes" to exclude the farmer's access to the farmhouse where the farmer resides while operating the farm would extend the covenant's restriction beyond what the parties clearly expressed. The covenant restricts the Right of Way to "farm purposes"—it does not say "agricultural equipment only" or "crop and livestock transport only." A farmhouse occupied by an active farmer who cultivates the land is a reasonable part of the farm operation, and accessing it serves a farm purpose. Mr. Senesac cannot reasonably claim that the Right of Way can provide access to three homes, but that providing access to a fourth is unduly burdensome.

The Court therefore concludes that "farm purposes" encompasses residential access to a farmhouse when the occupant actively farms the land. Because the Muirs actively farm their 80-acre parcel – having leased pastureland, enrolled in Current Use, obtained a Forestry Management Plan, and purchased farm equipment – their access to the farmhouse serves a "farm purpose" within the meaning of the covenant.

However, this holding is narrow. It does not authorize unrestricted residential use of the Right of Way by any future owner, regardless of farming activity. The covenant limits the Right of Way to "farm purposes only," and this Court's interpretation ties residential access to active farming. If the Farm Parcel ceased to operate as a farm, residential-only access over the Right of Way would exceed the covenant's scope.

## III. Defendant's Affirmative Defenses Bar Plaintiff's Claim

Although the Court concludes Mr. Senesac does not have standing, and the Muirs' use falls within farm purpose only restriction, the Court still considers the Muirs' equitable defenses as alternative bases for judgment in this case. The Muirs raised three affirmative defenses: (1) laches, (2) equitable estoppel, and (3) waiver – each of which is a distinct equitable defense with their own elements of proof. Based on the discussion below, Mr. Senesac's claim would also fail due to laches and equitable estoppel/implied waiver.

### A. Laches

"Laches is the failure to assert a right for an unreasonable and unexplained period of time when the delay has been prejudicial to the adverse party, rendering it inequitable to enforce the right." *Stamato v. Quazzo*, 139 Vt. 155, 157 (1980). The doctrine requires both an unexcused delay and resulting prejudice. *Id.* ("Laches does not arise from delay alone, but from delay that works disadvantage to another"). The Court exercises broad discretion in applying laches. *Chittenden v. Waterbury Ctr. Cmty. Church, Inc.*, 168 Vt. 478, 484 (1998).

### 1. Unreasonable and Unexplained Delay

Mr. Senesac knew of the "farm purposes" covenant long before the Gaboriaults began building the farmhouse in 2019. He believed he had the right to prevent non-farm use of the Right of Way. Yet he never objected when he learned the Gaboriaults planned to build a home; not during the roughly two years of construction and not during the several years the Gaboriaults lived in the farmhouse using the Right of Way daily for residential access.

Mr. Senesac did more than stay silent: he actively helped build the very farmhouse whose residential use he now challenges, and the Gaboriaults paid him for that work. When he discussed the covenant with Gaboriault, he characterized its purpose as preventing subdivision, not as a bar on residential access.

Mr. Senesac waited approximately five years, from the start of construction in 2019 until filing this action, before asserting his claimed right. His only stated reason for not raising this issue with the Gaboriaults is that he "did not believe he could control" what the Gaboriaults built on their own land. However, that explanation does not address why he never objected to the Gaboriaults' use of the Right of Way to construct the house and the Gaboriaults' subsequent daily residential use of the Right of Way, which is the precise conduct he now seeks to prevent the Muirs from doing. The delay was unreasonable and unexplained.

The Vermont Supreme Court confronted a similar fact pattern in *Mann v. Levin*, with one key difference. 2004 VT 100. There, the court rejected a laches defense because the neighbor "immediately informed [the homeowner] of their concerns when it became apparent to them that her building would violate the covenant." *Id.* at ¶ 26. In that instance, the plaintiff raised the issue directly with the defendant as soon as she saw a truss placed on the home that exceeded the height restriction.

Mr. Senesac did the opposite. He watched construction start, helped with it, accepted payment for assisting with it, and said nothing to anyone about enforcing the covenant for years. When he finally raised the issue, he did not speak to the Muirs or their agents; he spoke to Gaboriaults' lawyer and yelled something vague at their realtor.

### 2. *Prejudice to the Defendants*

Mr. Senesac's silence prejudiced the Muirs in concrete ways. The Gaboriaults built and occupied the farmhouse for years without any challenge to their use of the Right of Way. They then listed and sold the property as a farm with a farmhouse, without disclosing the covenant dispute. The Gaboriaults because, from their perspective, based on Mr. Senesac's conduct and silence, no dispute existed.

The Muirs purchased the property in reliance on the observable facts: the Gaboriaults had built a farmhouse, lived in it for years, and used the Right of Way daily for residential access without objection. Their title attorney confirmed there would be no issues as long as they continued to use the property for farm purposes, which was their plan. The Muirs paid the price of a property with an accessible farmhouse. Mr. Muir testified that they would not have purchased the property—or at least would not have paid the price they did—if they had known of an active dispute about their right to access the farmhouse.

Had Mr. Senesac asserted his claim when construction began in approximately 2019, the Gaboriaults may not have ever built a home. Had Mr. Senesac raised the issue to the Gaboriaults while they were using the home between 2020-2023 before they listed the home for sale, the Gaboriaults would have had an obligation to disclose it to the Muirs before they purchased the home. Instead, Mr. Senesac testified that he chose to wait until new people bought the home to sort it out with them.

Mr. Senesac's first communication to the Muirs came via his attorney's September 2023 letter—two months after the Muirs had purchased the property and occupied the farmhouse—and that letter sought "payment" in exchange for an expanded right of way. The timing suggests Mr. Senesac sought a financial windfall rather than the vindication of a long-held right.

Regardless of Mr. Senesac's motivation for raising the issue with the Muirs, the fact remains that his delay greatly prejudiced the Muirs. They purchased a property with no known property disputes at full price. Laches bars his claim.

## B. Equitable Estoppel/Implied Waiver

The Muirs also raise equitable estoppel and waiver as affirmative defenses. "A 'waiver' is the intentional relinquishment or abandonment of a known right, and the act of waiver may be evidenced by express words as well as by conduct." *Lynda Lee Fashions, Inc. v. Sharp Offset Printing, Inc.*, 134 Vt. 167, 170 (1976). "To succeed on an implied waiver theory, [the Muirs] must show some act or conduct on the part of [Mr. Senesac] that was unequivocal in character." *Anderson v. Coop. Ins. Cos.*, 2006 VT 1, ¶ 11. The Court does not find an express waiver here. However, the Court will analyze the Muirs' defense as a claim for equitable estoppel or implied waiver.

Vermont courts have recognized that implied waiver "blurs the lines between waiver and estoppel" and requires the party asserting it to "show that she honestly and reasonably believed, based on the defendant's conduct, that the defendant would forego asserting some right to which it was otherwise entitled, and that the plaintiff acted to her detriment in reliance on that belief." *Anderson*, 2006 VT 1, ¶ 11 (quoting *Brown v. Taylor*, 120 N.M. 302, 901 P.2d 720, 723–24 (1995)); see Restatement (Third) of Property: Servitudes § 7.6, Reporter's Note (noting that waiver is "sometimes used to describe situations in which the rule [for modification of servitudes by estoppel] would apply"). The Court will analyze these two concepts under the equitable estoppel framework.

To establish equitable estoppel, the Muirs must show: "(1) the party to be estopped must know the facts; (2) the party being estopped must intend that his conduct shall be acted upon or the acts must be such that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the conduct of the party to be estopped to his detriment." *Wesco, Inc. v. City of Montpelier*, 169 Vt. 520, 524 (1999); *In re Langlois/Novicki Variance Denial*, 2017 VT 76, ¶ 12; *accord* Restatement (Third) of Property: Servitudes § 7.6 (2000) (servitude modified when benefit holder communicates, by conduct, words, or silence, an intent not to enforce, and burdened party foreseeably and detrimentally changes position in reliance). Vermont already recognizes that conduct alone can extinguish a deeded easement entirely through abandonment, a far more drastic result than modification. See *Lague, Inc. v. Royea*, 152 Vt. 499, 502–03 (1989) (holding that acts "conclusively and unequivocally" manifesting intent to relinquish an easement suffice without any showing of reliance). If conduct can destroy a servitude, it can certainly take the more modest step of narrowing one's scope.

Because the Muirs did not know anything about Mr. Senesac's actions at the time the house was constructed, a threshold question here is whether the Muirs, as successors in interest to the Gaboriaults, may rely on Mr. Senesac's conduct toward the Gaboriaults. They can. When estoppel modifies or extinguishes a servitude, that change runs with the land and binds all successors in interest. Restatement (Third) of Property: Servitudes § 7.6 (2000); see *Assad v. Sea Lavender, LLC*, 95 Mass. App. Ct. 689, 696–97 (2019) (holding that predecessor's modification of easement by estoppel bound successor who took title with knowledge of the arrangement); *Kienzle v. Myers*, 167 Ohio App. 3d 78, 84–85 (2006) (holding that easement by estoppel created by predecessor's conduct bound successor in title); see *Bruno v. Zilvitis*, No. 205-4-11 WRCV, 2014 WL 10321334, at *6 (Vt. Super. Oct. 1, 2014) (citing § 7.6 in analyzing

whether conduct extinguished a prescriptive easement); *Daylight Lot Major Subdivision Amendment Application*, Nos. 22-CV-01101, 22-ENV-00026, 2023 WL 2387875, at \*5–6 (Vt. Super. Feb. 27, 2023) (analyzing servitude claims under Restatement §§ 2.9 and 2.10).  The Court therefore examines whether Mr. Senesac's conduct toward the Gaboriaults created an estoppel, and if it did, that estoppel benefits the Muirs.

All four *Wesco* elements are satisfied in this case.  Mr. Senesac knew of the "farm purposes" covenant, believed it gave him the right to restrict how others used the Right of Way, and knew the Gaboriaults planned to build a home on the Farm Parcel and would use the Right of Way to reach it.  Rather than assert his claimed right, he helped build the farmhouse, accepted payment for the work, and told Mr. Gaboriault the covenant existed to prevent subdivision, not to bar residential access.  He watched construction and delivery vehicles use the Right of Way for roughly two years and never objected.  He visited the completed farmhouse multiple times and maintained a friendly relationship with the Gaboriaults throughout their residence in the farmhouse.  These acts went well beyond passive acquiescence; under both *Wesco* and § 7.6, they communicated that Mr. Senesac did not regard the Gaboriaults' residential use of the Right of Way as a violation.

The Gaboriaults, for their part, did not know that Mr. Senesac claimed the covenant barred residential access.  They knew the covenant existed but believed, based on Mr. Senesac's own statements and conduct, that a farmhouse fell within "farm purposes."  They relied on that understanding to their detriment: they built the farmhouse, invested substantial time and money in construction, occupied it for three years, and sold the property without disclosing any covenant dispute because, from their perspective, none existed.

Had Mr. Senesac objected when construction began, the Gaboriaults might never have built the home.  Their decision to build a farmhouse that depended on the Right of Way for access placed that access out of their control.  See *Kienzle*, 167 Ohio App. 3d at 85 (holding that "prejudice" in easement-by-estoppel analysis means a change in position that places the relying party's interest "out of her control," not that the opposing party actually enforced the right).

The Gaboriaults' reliance far exceeds the threshold Vermont courts have required.[2]  In *Bruno*, the court rejected an estoppel defense because the defendants showed no detrimental reliance beyond maintaining the status quo.  2014 WL 10321334, at \*6.  In *Daylight Lot*, the court found insufficient change of position where the neighbors' reliance consisted only of allowing trees to be cut on their property.  2023 WL 2387875, at \*7.  The Gaboriaults' investment in building a farmhouse, occupying it for years, and selling the property without disclosing a covenant dispute dwarfs either of those cases.

---

[2] Determining whether a benefactor abandoned a servitude does not require reliance.  See *Lague*, 152 Vt. 499, 502–03 (1989) (highlighting reliance is not necessary for abandonment).  The remedy for abandonment of an easement is extinguishment of the easement – a much more severe outcome than modification of an easement, which is the remedy for estoppel.  The Court notes the anomaly of having to prove less to extinguish an easement than to modify it.  Nonetheless, the Court adheres to Vermont's precedent, which finds reliance required in estoppel cases.

Mr. Senesac's conduct estopped him from enforcing the "farm purposes" covenant to bar residential access to the farmhouse. Put differently, his actions impliedly waived his right to enforce. That modification of the restrictive covenant now runs with the land. The Muirs, as successors in interest to the Gaboriaults, inherit the benefit of that estoppel.

The Court's analysis of Mr. Senesac's conduct under the estoppel context, therefore, applies with equal force here.

Electronically signed on May 28, 2026, pursuant to V.R.E.F. 9(d).


_____
Navah C. Spero
Superior Court Judge

_____
Sherri Potvin
Assistant Judge